HOBBS, Respondent, v. WHITELOCK (HARDING COUNTY BANK, Intervenor), Respondent.

(231 N. W. 904.)

(File No. 6955.   Opinion filed August 12, 1930.)

*C. L. Brady,* of Buffalo, and *Dan McCutchen,* of Belle Fourche, for Appellant.

*L. M. Simons,* of Belle Fourche, for Respondents.

BROWN, P. J.   On November 1, 1924, plaintiff and defendant entered into an agreement in writing as follows:

"Landlord and Tenant's Agreement.

"This instrument, made this first day of Nov. 1924 by and between W. H. Whitelock, party of the first part, hereinafter designated the landlord and Robert G. Hobbs party of the second part and designated as the tenant, Witnesseth: the tenant agrees to

continue running the ranch owned by the landlord, for an indefinite period, furnishing all labor connected therewith, and for his labor he shall receive one half of the net returns subject to the following stipulations. The landlord agrees to furnish the following live stock which are on the ranch:

500 2 year old ewes
110 1 year old ewes
383 3's, 4's and 5 year old ewes
158 ewe lambs
18 bucks, making a total of 1169 sheep
25 cows, two to five years old
2 hogs five months old
40 chickens
1 registered bull Polled angus 2 yr. old
13 3 year old steers
3 1 year old steers
1 mare nine years old, weight 1,100
2 geldings 8 years old weight 1,250 each
200 bushels of barley
2 mares furnished by the tenant

"The landlord shall also furnish the farm machinery now on the ranch, and the tenant shall keep the same in good repair at his own expense. Should the tenant use any of the machinery in the employ of others then the net returns shall be divided equally. The tenant shall at the termination of this agreement deliver to the landlord the above livestock, in like numbers, ages and character as mentioned above. After the original number has been returned, then the increase shall be divided equally. The tenant shall furnish the hay and all roughage. He shall endeavor to raise enough grain to winter said stock, but in case of failure, due to conditions beyond his control, and be compelled to buy grain then the cost shall be divided equally. The taxes on all real and personal property shall be divided equally. All land leases shall be divided equaly. The cost of seed grain shall be divided equally. The sale of any hay, grain, butter, cream, milk, wool, lambs or old ewes shall be divided equally. The checks, drafts or money for wool or lambs shall be payable to the landlord, and he in turn shall promptly pay to the tenant his share after the taxes and other expenses have been deducted. The tenant shall keep a correct record of all sales

and submit them on request. The expense of furnishing additional bucks either in trading or by purchasing shall be divided equally. The price of wool sacks, twine and shearing shall be divided equally. The tenant agrees to deliver all stock and wool to the railroad.

"This agreement may be terminated at any time by agreement of both parties hereto. If terminated by one party, that he shall give the other party three months notice or more, unless the tenant shall fail or neglect to care for the personal property or buildings in a husband-like manner, then the landlord reserves the right to enter the premises and terminate this agreement at once.

"In witness whereof the parties have set their hands and seals the day and year first written above.

"Landlord, W. H. Whitelock.

"Tenant, Robert G. Hobbs.

"In the presence of ——————.''

They had conducted the same line of business for ten years previously under two similar contracts, each of which had run about five years. In October, 1926, defendant notified plaintiff that he had sold the ranch, and that the contract between them would terminate in the fall of 1927. On January 12, 1927, the intervener wrote defendant, asking, in substance what was plaintiff's interest in the live stock and personal property on the ranch, as plaintiff desired to borrow from intervener a little money for use on the ranch and the bank desired to know upon what property he could give security. On January 19th defendant replied that plaintiff would "have his half of the wool coming to him this summer less one-half of the taxes which should secure you against a small loan to him. But * * * I would suggest that you loan him not to exceed $200." At the time intervener wrote defendant it had plaintiff's note for $1,380 for an obligation which seems to have been held by the bank for a long time prior thereto, having been renewed from time to time. After receiving defendant's letter, intervener loaned plaintiff $100 and took a mortgage on the undivided one-half of the wool to secure the note for $100 and also the $1,380 note. Defendant sold the wool for $3,164.35. The taxes were $697.12, making the amount of wool proceeds less taxes $2,467.23, of which one-half is $1,233.61. On August 15, 1927, a sale of all the property, other than the wool, which had been previously sold, was held,

and defendant got the proceeds of this sale. He claimed that, on an adjustment of accounts between him and plaintiff arising from the lease alone, plaintiff was owing him $381.77. Plaintiff, claiming that on an adjustment of accounts there should be due him the sum of $3,158.89, brought this action to recover the amount.

Defendant answered, setting out the items of the account between him and plaintiff in detail, alleging that prior to the making of the contract dated November 1, 1924, plaintiff and defendant had a mutual settlement upon which it was found there was a balance due defendant from plaintiff of $849.22, which it was agreed should be carried in open account between the parties; that from January 1, 1927, to August 18, 1927, defendant advanced money on account of plaintiff for the conduct of the business to the amount of $2,335.61, the items of which were set out in the answer; that he paid on behalf of plaintiff personally $816, likewise itemized; that plaintiff had paid items for the business amounting in all to $33.98; that defendant had received for wool $3,164.35, and for pelts and hide $5.74, making total receipts $3,170.09; that, deducting expenditures from receipts on account of the ranch, left a balance of $834.48 of which plaintiff's one-half was $417.24; that plaintiff was also entitled to be credited with one-half of the $33.98 which he had paid out, making $434.23, which, deducted from the $816 which defendant had advanced to plaintiff personally, left a balance of $381.77 still due to defendant, in addition to the $849.22 due on settlement of November 1, 1924; that, on allowance to defendant of the value of the sheep that should have been returned to him at the termination of the lease, which valuation was set out by items, there would be a balance in favor of defendant of $1,056.90 on account of sheep; that defendant furnished plaintiff at the beginning of the lease 200 bushels of barley of the value of $124; that plaintiff butchered for his own use a heifer belonging to defendant of the value of $37, making total credits due defendant from plaintiff amounting to the sum of $2,448.89; that plaintiff was entitled to credit of $274.25, the value of cattle returned in excess of those furnished at the beginning of the lease, and $35, value of hogs so returned, and to the sum of $12.50 on account of a wagon, anvil, and some chickens, making total credits due plaintiff $321.75, which, deducted from the $2,448.89 due defendant left a balance in defendant's favor of $2,127.14, for which

sum by way of counterclaim defendant demanded judgment against plaintiff.

The Harding County Bank intervened, setting out its notes for $100 and $1,380 and the mortgage securing the same and asking judgment against defendant for the amount due on said notes and mortgage. Defendant answered the complaint in intervention, setting up, in substance, a general denial, and a counterclaim based on allegations to the effect that the intervener had interfered with the sale, and had announced publicly at the commencement of the sale that it claimed to have a mortgage lien on the property prior to any interest of defendant therein, and that any purchaser of any part of the property would take it subject to the lien of said mortgage of intervener, and that such announcement caused intending bidders at the sale to refrain from bidding and resulted in the property being sacrificed at prices far below its value, and demanded affirmative judgment against the intervener.

The jury found a verdict in favor of plaintiff and against defendant for the sum of $3,044.20, and a verdict in favor of the intervener and against defendant for $1,233.61, on which verdicts a judgment was rendered in favor of plaintiff *and* intervener for $3,044.20, together with the costs of the action, and, from the judgment and an order denying a new trial, defendant appeals.

We shall deal first with the claim of the intervener. The instructions to which we shall refer were duly excepted to, and instructions in a contrary sense requested by appellant. On the claim of the intervener, the court instructed the jury to return a verdict in the following form:

"We, the Jury, duly and legally empannelled to try the above entitled action, find for the intervener, Harding County Bank, and against the defendant, W. H. Whitelock, upon all the issues, and assess its damages in the sum of $1,233.61."

This direction of a verdict in favor of the intervener was apparently based in so far as the amount of it is concerned, upon the fact that intervener had a mortgage on plaintiff's undivided one-half interest in the wool, and that the proceeds of the sale of the wool less 1926 taxes were $2,467.23 of which one-half is $1,233.61. Upon what theory the court concluded the intervener was entitled to the direction of a verdict for any sum in excess of the amount due on the $100 note is not apparent from the record.

Hazarding a guess, we may suppose that the trial court thought that defendant was estopped by his letter of January 19th from questioning any action that intervener might take with reference to plaintiff's share in the wool. But it is entirely plain that defendant could not be estopped to any amount greater than $200 to assert any interest he might have in the wool, and he could only be estopped as to whatever amount the intervener should actually loan plaintiff within the limit of $200 in reliance upon the letter of January 19th. The only amount that it loaned was $100, and the sum due on the note for that amount was all that intervener was entitled to recover against defendant, unless on a final adjustment of accounts between plaintiff and defendant a balance is due plaintiff greater than the sum due on the $100 note, in which event intervener may have such judgment as it obtains against plaintiff adjudged to be a lien on the balance due plaintiff from defendant. This is too plain to call for any citation of authority.

■■ The court excluded all evidence in support of defendant's counterclaim against intervener and instructed the jury in one part of the charge to give no consideration to the counterclaim, as the same had been dismissed by the court. At a later part of the charge the court instructed the jury that, as to this counterclaim, "the burden of proof is on the defendant to establish the allegations thereof by a preponderance of the evidence." The charge of the court on this branch of the case must have been perplexing to the jury. After being told to give no consideration at all to the counterclaim because it had been dismissed by the court, the jury is told that the burden of proof is on defendant to establish the allegations of this counterclaim, as to which all evidence had been excluded. In regard to the counterclaim we may say that defendant was entitled to submit proof in support thereof, and to have the question of his damages growing out of the counterclaim submitted to the jury. Any objection that it was not a proper subject of counterclaim should have been raised by demurrer, because whether or not it was a proper subject of counterclaim appeared upon the face of the answer, and the objection that it was not available as a counterclaim was waived by failure to demur on that ground. Walker v. Johnson, 28 Minn. 147, 9 N. W. 632; Mississippi & R. R. Boom Co. v. Prince, 34 Minn. 71, 24 N. W. 344; Talty v. Torling, 79 Minn. 386, 82 N. W. 632.

■ Turning now to the verdict in favor of plaintiff against defendant, we consider, first, errors assigned upon the admission of oral testimony by plaintiff as to the meaning of the terms of the lease. Over objections by defendant, plaintiff was permitted to testify that at the time of the execution of the lease he asked defendant what was meant by the return of live stock in like number, ages, and character; that Whitelock responded, What do you think it means? and plaintiff told him that he thought it meant that at the termination of the lease "as many of the original number of stock should be returned as were then alive and that the balance should be made up from the undivided increases"; that Whitelock agreed to this, and said, "Certainly—we will have no trouble over that matter." The court also instructed the jury that this clause in the lease meant that plaintiff should at the termination of the contract "return to defendant as many of the original animals as are then alive and in his possession, and any shortage in that number to be made up from the undivided increase of such animals and the balance remaining after such shortagge has been made up shall be equally divided between said plaintiff and said defendant." We think this construction is plainly erroneous. The lease was to run for an indefinite period. Two similar contracts between the parties had run five years each without renewal. If this lease had run five years the 500 two year old ewes would have been seven years old and worth from $3 to $4 a head instead of $13, their approximate value when turned over to plaintiff. Had values remained fairly constant and if no consideration was to be given either to sex or ages, as the instructions of the court implied, then any shortage of two year old eyes worth $13 a head could have been made up with either ewe or wether lambs worth no more than half that amount. But, regardless of such unreasonable results, implicit in the court's instructions on this point, the language of the contract itself is clear and unambiguous and requires neither the testimony of parties nor unusual acumen to construe it. It says that at the termination of the agreement plaintiff shall deliver to defendant live stock in like numbers, ages, and character to those delivered to the tenant at the commencement of the lease or contract. Beyond any question that means that there was too be returned to defendant 500 two year old ewes, 110 one year old ewes, 383 three, four and five year old ewes, 158 ewe

lambs, and 18 bucks, making a total of 1,169. He was not necessarily to get back the same sheep he had delivered, nor was he to get back any of those sheep unless they correspond in ages and character (sex) with those enumerated. The error of the court on this branch of the case was alone sufficiently serious and prejudicial to require a reversal of the judgment, but, as other errors are assigned on questions which are likely to arise should another trial be had, we deem it our duty to consider the more important of those assignments. Cross-examination of plaintiff and of intervener's cashier was far too much restricted; most of the questions excluded on such cross examination should have been allowed.

Plaintiff was permitted to testify that as to the 13 head of three year old steers he was not to return any steers, but that those steers were to be sold and $650 of the purchase price was to go to defendant, presumably to reimburse defendant for the original cost of the steers, and the balance was to be divided. This testimony was in flat contradiction of the terms of the written contract, and should not have been admitted. Plaintiff testified that he read the written contract and knew its contents before signing it.

Plaintiff was permitted to testify in detail as to the number of live stock which he claimed were turned over to or taken by defendant on August 15, 1927, and to the value of such live stock, but stated that he could not give the classification as to ages. He said the contract required him to return 1,151 female sheep; that he had but 1,071 on hand when the contract terminated, but could not tell how many of these were lambs, how many were one year old, how many two years old, or how many three, four, or five years old. He admitted that he was in charge of the live stock from the beginning to the end of the business under the contract; that he and defendant had counted some of the sheep a few days prior to the commencement of the lease, but that defendant took his word for the count as to the rest of the sheep, and was supposed to know about the number of the other live stock as well as plaintiff was; that plaintiff was some 80 head short of returning the number of female sheep that he ought to have returned; that he did not count the sheep on the date of sale, but did within a week thereafter, but could not remember how many sheep or lambs there were; that he never set down the number; that at shearing time

there was 510 lambs, but possibly as many as 160 perished during the month.

On the defense, by proper questions, defendant attempted to show by the testimony of two witnesses, each of whom had been many years in the sheep business, that in September, 1927, they had assisted defendant in counting and classifying the sheep, which defendant had testified were the same sheep which were gotten from plaintiff the previous month; that they had kept an accurate record and tally list of the sheep by ages, and the count had been made by passing the sheep one by one through a gate, one of the witnesses working the gate, and defendant offered this list, marked "Exhibit 4," in evidence. An objection that it was incompetent, irrelevant, and immaterial, and no foundation had been laid was sustained. We think this was error. A memorandum of the number of sheep of different ages in a bunch of 1,151 altogether, which memorandum witnesses who made the count testify they know was correct the time it was made, is admissible in evidence. 22 C. J. 893 et seq. These same witnesses having qualified as being in the sheep business, buying and selling sheep and keeping informed on the market values of sheep, were asked what were the values per head of the several classes of sheep. An objection that this was "immaterial, irrelevant and incompetent under the state of the record as it now stands" was sustained. This was error. Defendant thereafter made an offer to prove by these same witnesses that the values of the sheep of different ages were certain specified sums per head and what the total value of the bunch was. This was objected to on the ground that the witnesses were not qualified to answer, that it did not appear that the witnesses were familiar with the sheep at the time of the taking possession thereof by defendant, and that it did not appear from the *testimony of the witness* that the sheep were the same taken possession of by defendant or that they were in the same condition or in the same number as taken over by defendant. The objection was erroneously sustained. Defendant had at this time testified to the identity of the sheep. The time the witness made the count and observed the sheep was not at the most more than six weeks distant from the time defendant got the sheep, and within the showing of the record may not have been more than two weeks distant. In either case the time was not so remote but what the evidence was admissible. 22 C. J. 86; Windedahl v. Harris, 37 S. D. 7, 156 N. W. 489.

■ The court excluded evidence offered on behalf of defendant tending to show that plaintiff agreed to the holding of the sale. This was error. If plaintiff agreed to the holding of the sale, defendant could only be required to account for what things sold for, and not for their reasonable or actual value. The testimony offered by defendant on this branch of the case should have been admitted.

■ At the time intervener's mortgage was taken, intervener procured from plaintiff a statement of his claimed assets and liabilities as an alleged basis of credit. This statement, denominated "Exhibit U," was admitted in evidence over the objection of defendant. This statement was purely hearsay as to defendant, was self-serving as to plaintiff, and was clearly inadmissible.

Numerous other errors are assigned on the admission and exclusion of evidence and the giving and refusing of instructions, but we think what we have already said will enable the trial court to deal properly with the questions involved in such assignments in the event of another trial.

The judgment and order appealed from are reversed.

POLLEY, SHERWOOD, CAMPBELL, and BURCH, JJ., concur.