Ralph E. MUELLER and Eugene D. Devane, Appellees-Cross-Appellants,

v.

HUBBARD MILLING COMPANY, Appellant-Cross-Appellee.

Nos. 77–1413, 77–1432.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 18, 1977.

Decided April 10, 1978.

Rehearing and Rehearing En Banc Denied May 2, 1978.

George D. McClintock, Faegre & Benson, Minneapolis, Minn., for Hubbard; Lawrence C. Brown and Jerry W. Snider, Faegre & Benson, Minneapolis, Minn., on the brief.

Charles Quaintance, Jr., Maslon, Kaplan, Edelman, Borman, Brand & McNulty, Minneapolis, Minn., for Mueller et al.; Martin G. Weinstein and Barbara R. Hauser, Maslon, Kaplan, Edelman, Borman, Brand & McNulty, Minneapolis, Minn., on the brief.

Before VAN OOSTERHOUT, Senior Circuit Judge, and LAY and STEPHENSON, Circuit Judges.

VAN OOSTERHOUT, Senior Circuit Judge.

Ralph E. Mueller and Eugene D. Devane brought this action in the United States District Court for the District of Minnesota against Hubbard Milling Company (Hubbard) to recover certain investment losses

sustained by them as limited partners in two limited partnership cattle feeding ventures, referred to by the parties as Dakota 14 and Dakota 16, in which Hubbard acted as sole general partner. Following extensive pretrial discovery and a lengthy trial, the cause was submitted to a jury on four theories of liability: federal securities law violations, common law fraud, breach of contract and breach of fiduciary duty. Hubbard's request for special verdict forms was denied, and the jury was instructed to return general verdicts with respect to each of the two plaintiffs and each of the two limited partnerships (a total of four verdicts). Substantial verdicts were returned for plaintiffs in each instance. The Dakota 16 verdicts substantially exceeded the amount sought by plaintiffs and the maximum amount sustainable by the evidence. Plaintiffs later consented to remittiturs on the Dakota 16 verdicts, and judgments were entered on the Dakota 14 verdicts as returned and the Dakota 16 verdicts as remitted. Post-trial relief sought by Hubbard was denied.[1] Alleging numerous grounds for reversal, Hubbard appeals. Plaintiffs cross-appeal from a denial of their claim for prejudgment interest.

For the reasons stated herein, we vacate the judgments entered below, dismiss plaintiffs' cross-appeal without prejudice and remand for further proceedings.

## I.

Dakota 14 and Dakota 16 were the last in a series of eight limited partnerships in which Hubbard acted as general partner and plaintiffs as limited partners. All of the partnerships were formed for the purpose of fattening cattle to slaughter weight at feedlot facilities operated by Fall River Feedlots, Inc. (Fall River), in Hot Springs, South Dakota. Fall River was owned 75% by Hubbard and 25% by T. M. Largent, Fall River's president and manager. Largent

was responsible to John McNeal, a vice president of Hubbard, for his actions as feedlot manager. In addition to supervising Largent, McNeal was responsible for Hubbard's performance of its duties as general partner under the partnership agreements. For each limited partnership Largent bought, fattened and sold a herd of cattle; the partnership was then dissolved.

All of the capital in the limited partnerships was contributed by the limited partners; in addition to cash contributions, the limited partners provided letters of credit.[2] In exchange for its management services, Hubbard received from the partnership a per head fee, which was four dollars for both Dakota 14 and Dakota 16. Hubbard also received a sliding percentage of any profit, ranging from five per cent of the first ten dollars per head profit to twenty per cent of the total profit if it exceeded twenty-four dollars per head.

Mueller and Devane were without question experienced investors. The partnership agreements were modeled after a limited partnership agreement (Dakota 1) offered by the First National Bank of Minneapolis to its customers as part of an investment opportunities package known as "Total Plan." The partnerships provided a significant tax shelter for the limited partners. Mueller at times consulted his attorney and his accountant with respect to the investments. In 1972 and 1973 Mueller had also formed and been president of a cattle placement and monitoring business, which purchased about 25,000 head of cattle for its customers.

The partnerships were formed pursuant to the Uniform Limited Partnership Act as enacted in South Dakota, South Dakota Compiled Laws Annotated, chapter 48–6 (1967). The agreements recited that they "shall be construed and enforced in accordance with the laws of the State of South Dakota."

---

1. Hubbard did not seek the remittiturs.

2. On Dakota 14, Mueller contributed $65,718 and provided a letter of credit in the amount of $91,275; Devane contributed $26,082 and provided a letter of credit in the amount of $36,-

225. On Dakota 16, Mueller contributed $91,-800 and provided a letter of credit in the amount of $127,000; Devane contributed $16,-200 and provided a letter of credit in the amount of $22,500.

Paragraph 8 of the agreements vested exclusive management of the partnerships in Hubbard; Hubbard was authorized, *inter alia:*

    (a) to purchase, hold and sell cattle;

    (b) to engage, at its discretion, in "hedging" activities including advance contracting and commodities futures trading in cattle, and to utilize Partnership assets in an amount not to exceed $10 per head of Partnership cattle owned at the time of such hedging activities to cover the costs thereof;

    (c) to borrow money from such person or persons in such manner, on such security (including assets of the Partnership and assets pledged to the Partnership) and on such terms as it may see fit, provided that such borrowings must be made without recourse to the Partnership or to any Partner[.]

Paragraph 17 provided: "No Limited Partner shall participate in the control, operation or management of the Partnership business" and "The Limited Partners hereby consent to any purchase or other acquisition, sale, lease, exchange, conveyance or other disposition, mortgage or other encumbrance by the General Partner on behalf of the Partnership, of any or all property now or hereafter acquired for the Partnership, on such terms and conditions as may be determined by the General Partner, notwithstanding that any party hereto may have an interest therein."

At the risk of oversimplification and without attempting to relate all or even most of the relevant evidence, we outline the particular events which gave rise to this lawsuit. Although the agreement for Dakota 14 was executed prior to the one for Dakota 16, the dispute over Dakota 16 developed first, and we accordingly discuss it first.

In the feeder cattle business, the term "breakeven" refers to an estimated price at which cattle must be sold in order to "break even" with the original purchase expense and the cost of feeding. The central controversy over Dakota 16 concerns statements allegedly made by McNeal that Hubbard would notify plaintiffs before purchasing any cattle at breakevens higher than forty-five cents per pound.

Prior to October 15, 1973, Mueller, according to his own testimony, was reluctant to form Dakota 16 because of difficulties then being encountered with Dakota 14 and its immediate predecessor, Dakota 12. Discussing the matter with McNeal, he explained, "we just can't buy ourselves into another loss position." In the course of negotiations, McNeal allegedly made a number of statements which induced plaintiffs to execute the agreement. Most significantly,[3] he "agreed that if we would go into this partnership that he would call us before any cattle were purchased if they were above 43 or 45 cents, if they were above the 45-cent range."

The Dakota 16 agreement was executed on October 15, 1973. Paragraph 5 recited: "The Partnership shall purchase an aggregate of 2,000 feeder cattle and calves during the period from November 1, 1973 through February 14, 1974 and shall market the fattened cattle in lots during the period of March through August of 1974."

On November 12, 1973, Hubbard transferred to Dakota 16, 417 head of cattle which Fall River had previously purchased, some of them in early October. Mueller and Devane did not learn of the transfer until November 27. Upon learning of the transfer, Mueller called McNeal to express concern over Hubbard's transferring cattle purchased before the Dakota 16 agreement was executed, and more especially, over the fact that the 417 cattle had been purchased at breakevens of forty-seven cents. He explained that the purchase would cause him to have trouble with his banker because his banker had loaned him the money for Dako-

---

**3.** Among other statements allegedly made at this time are the following: McNeal allegedly stated that other persons were anxious to take space in the feedlot if plaintiffs decided not to proceed; this statement allegedly was false.

McNeal allegedly stated that "things would get better after the first of the year"; Largent allegedly stated that Dakota 16 would be "a real barn burner."

ta 16 on the basis that purchases would be at breakevens of forty-three to forty-five cents. Mueller testified that McNeal told him "they wouldn't do any more [purchasing] without talking to us."

No additional cattle were purchased for or transferred to Dakota 16 in November or December. However, Hubbard did purchase an additional 1,516 head of cattle, all at breakevens in excess of forty-five cents, at various times in January. Mueller testified he did not learn of these purchases until January 31.

Declining fat cattle prices, rising feed prices and other factors combined in making Dakota 16 a financial disaster. Hubbard sold the cattle on advance contract in June 1974. Mueller and Devane lost their entire investment, which amounted to $258,000. This sum is the total amount of the verdicts as remitted on Dakota 16.

The Dakota 14 agreement was executed on July 31, 1973. Paragraph 5 recited: "The partnership shall purchase an aggregate of 3,000 feeder cattle and calves during the period of August through October of 1973 and shall market the fattened cattle in lots during the period of January through April of 1974." The dispute over Dakota 14 concerns certain second letters of credit delivered by plaintiffs in December 1973. As already noted, *supra* note 2, plaintiffs had delivered first letters of credit at the time the partnership was formed.

The purchase and feeding of Dakota 14 cattle was financed through the First National Bank of the Black Hills. Under the financing agreement the bank had authority, at any time its loans exceeded 80% of the value of its collateral, to direct that the partnership's cattle—collateral on the loans—be sold. By early December 1973 Dakota 14 had acquired about 2752 head of cattle, the value of which had diminished with declining slaughter cattle prices. Con-

comitantly, increasing feed costs had necessitated greater loans from the bank than originally had been expected. As a result, on December 12, the bank, pursuant to its contractual authority, instructed Hubbard to sell the Dakota 14 cattle.

A December sale of the cattle would have resulted in a loss to the partnership of about $102 per head. Because of a belief that slaughter cattle prices would rise beginning in January, alternatives to the forced sale were sought. Testimony was adduced that the bank was willing to accept a guarantee from Hubbard in lieu of the sale and that Hubbard refused this offer. Plaintiffs contend this fact was fraudulently concealed from them.[4] In any event, Hubbard did advise plaintiffs: "The one alternative that the bank has offered to the Partnership is for the Limited Partners to provide an additional $197,000 in irrevocable letters of credit to be pledged to the bank as collateral to the loans."

Late in December plaintiffs did provide second letters of credit, Mueller in the amount of $79,920 and Devane in the amount of $31,718; also late in December the parties executed a "Memorandum Supplementing Limited Partnership Agreement" (the Supplementing Agreement). This agreement explained the problem that had developed with the bank, recited that Mueller and Devane thereby agreed to contribute to the partnership second letters of credit in the respective amounts noted above, and purported to set forth the understanding of the parties with respect to the second letters of credit. The events which attended the execution of these documents, and the sequence in which the events occurred, are the subject of much dispute.

Part of the dispute can be traced to the fact that the second letters of credit bear

---

**4.** Plaintiffs also contend that Hubbard fraudulently concealed from them the fact that the bank was requiring a compensating balance for its loans to Dakota 14. This arrangement allegedly had the effect of raising the interest rate on the loans from ten per cent to twelve

per cent. Plaintiffs further contend that the arrangement "raised a possible usury problem" under South Dakota law and that Hubbard breached its fiduciary duty to plaintiffs by failing to investigate this alleged problem.

the dates December 18 and 20 [5] while the Supplementing Agreement bears the dates December 28 and 31.[6] These dates are of some significance because of certain alleged communications on December 24 and 26.

According to Mueller's testimony, he called McNeal on December 24 to express his reluctance to go through with the second letters of credit because of the amount of money involved and the then-current cattle prices. This conversation was followed by a visit by Mueller to McNeal's office on December 26. Mueller described the substance of the December 26 meeting as follows:

> Well, the substance again is that we were reluctant to sign this supplement and come up with the additional letters of credit and our thought was that there would be a possibility of putting in some safeguard in which there would be—I guess you could call it a form of stop-loss agreement for this second letter of credit. So we discussed the approach to this, and which I had discussed with my attorney. We discussed the approach to it and then John McNeal also said that he felt that, again that this cattle price thing was going to straighten out after the first of the year and that 14 would be all right. I said, well, this is fine, but we sure don't want to lose this second letter of credit because we had already lost a lot of money obviously on 12 and that we were concerned about this. So we talked then about putting in a stop-loss provision or a provision in this that they would sell out this partnership to limit our loss to $100. per head, because what we were really doing by going into the second letter of credit, that we would lose considerably more than $100. a head, I think between $150 and $160. a head or more. So our concern was let's at least limit our exposure. Mr. McNeal, John said he thought they could do that and he would talk with their counsel and that they would see what they could do to get us a revised contract.

Then we talked about putting in some guarantee that this would happen. John McNeal said, well, he really didn't like to do this because it really fouled up the lawyers to ask them to write all these things in, but that they would really watch out for us.

Mueller further testified that McNeal said "he would take care of the situation, assured me that they would really do their best to really do this and to really take care of the situation so that we wouldn't lose more than $100."

The Supplementing Agreement executed by the parties contained the following "best efforts" clause:

> In order to attempt to minimize losses for Limited Partners in Dakota Feeders # 14, the General Partner agrees to use its best efforts to attempt to advance contract for the sale of the Partnership's cattle when futures prices fall to the levels set forth below. It is understood, however, that advance contracting can be done only if packers are willing to buy cattle at a fixed price for a future delivery date. * * * Since futures markets are sometimes very erratic, it may be impossible at times for the General Partner to effectively advance contract for the sale of any cattle. If, however, such a sale is possible, the following guidelines will be followed by the General Partner in determining when specific pens of cattle should be offered to packers for advance contracting. For pens Nos. 86, 14, 83, 73, 77, 51, 91 and 5, the General Partner agrees to use its best efforts to attempt to hold losses to $100 per head by advance contracting according to the guidelines set forth below[.]

The agreement made clear throughout, however, that Hubbard was not insuring plaintiffs against loss of their additional investments. It recited:

---

5. The letters of credit recite: "Effective December 18, 1973" and "Dated: December 20, 1973."

6. The Supplementing Agreement was signed by McNeal for Hubbard on December 28 and by Mueller and Devane on December 31.

The Limited Partners understand that the General Partner makes no representations as to the specific amounts of any loss per head on any specific pen pursuant to the above arrangement. The Limited Partners also understand that the General Partner's obligations under this arrangement are only to use its best efforts and that an advance contract sale at any time may not be possible.

The agreement also set forth the following conspicuous limitations:

EACH LIMITED PARTNER SHOULD UNDERSTAND THAT NEITHER THE PARTNERSHIP NOR THE GENERAL PARTNER HAS ANY BASIS FOR DETERMINING THE FUTURE MARKET PRICES FOR SLAUGHTER CATTLE. IF PRESENT PRICES SHOULD DECLINE, EACH LIMITED PARTNER MAY LOSE ALL OR A PART OF THE ADDITIONAL LETTER OF CREDIT TO BE CONTRIBUTED BY HIM.

NEITHER THE PARTNERSHIP NOR THE GENERAL PARTNER MAKES ANY ASSURANCE THAT SLAUGHTER CATTLE PRICES WILL INCREASE DURING THE PERIOD BETWEEN THE DATE HEREOF AND THE SCHEDULED MARKETING DATES. THERE IS IN FACT THE POSSIBILITY THAT SLAUGHTER CATTLE PRICES COULD BE LOWER ON SUCH DATES. SHOULD SUCH PRICES BE LOWER THAN THE PRESENT ESTIMATE ADVANCE CONTRACT PRICES USED TO CALCULATE THE LOSSES DESCRIBED ABOVE, THE LIMITED PARTNERS LOSSES WOULD BE HIGHER THAN CALCULATED ABOVE.

Slaughter cattle prices did rise in January 1974, but they fell during the following months. Mueller testified that he asked McNeal several times in January to advance contract the cattle, and it appears to be undisputed that losses would have been held to less than $100 per head if the cattle had been advance contracted in January. The evidence is, to say the least, disputed as to whether Hubbard made bona fide efforts to advance contract the cattle early in the year.

In the end, according to Mueller's testimony, the partnership lost about $155 per head, a sum which represented the plaintiffs' entire initial investment in Dakota 14 and approximately half the amount of the second letters of credit. The jury returned verdicts on Dakota 14 for Mueller in the amount of $58,389 and for Devane in the amount of $23,154. As indicated above, judgment was entered on these verdicts.

## II.

■ Hubbard contends, *inter alia*, that the district court's admission into evidence of testimony by Mueller concerning oral communications between Mueller and McNeal was erroneous and prejudicial with respect to the contract claims on both Dakota 14 and Dakota 16. We agree with Hubbard that as to the contract claims the testimony should have been excluded under the parol evidence rule.

Hubbard first objected to the alleged parol evidence early in the trial. At that time the trial court overruled the objection and indicated that it would not give a requested instruction limiting the jury's consideration of the evidence to the fraud claims;[7] Hubbard was granted a continuing objection. The objection was reasserted in Hubbard's motions for directed verdicts at the close of the plaintiffs' evidence and the close of all of the evidence and again in Hubbard's post-trial motion for judgment notwithstanding the verdict.

■ It will be recalled that the Dakota 14 and Dakota 16 agreements recite that they "shall be construed and enforced in accordance with the laws of the State of South Dakota." Under well-established principles, questions of substantive law concerning the construction and enforcement

---

7. The importance of Hubbard's request for a limiting instruction and of the trial court's refusal to give it cannot be over-emphasized.

The result we reach might be different if Hubbard had not made the request or if the trial court had granted it.

of the agreements are accordingly governed by South Dakota law. *Restatement (Second) of Conflict of Laws* § 187 (1969).[8] It is also well-established that the parol evidence issue before us is one of substantive law and falls within this rule. "Whether a contract is integrated in a writing and, if so, the effects of integration are determined by the local law of the state selected by application of the rules of §§ 187–188." *Id.* § 140. *Accord: Shewe v. Bentsen*, 424 F.2d 60, 62 (5th Cir. 1970); *Merchants Nat'l Bank & Trust Co. v. Professional Men's Assn.*, 409 F.2d 600, 602–03 (5th Cir. 1969); *Kirtley v. Abrams*, 299 F.2d 341, 345 n. 6 (2d Cir. 1962); *Long v. Morris*, 128 F.2d 653, 141 A.L.R. 1041 (3d Cir. 1942); Annot., 141 A.L.R. 1043 (1942). The rationale behind *Restatement* Section 140 is both simple and sound: "Rules which determine when a contract is integrated should be determined by the law which governs the contract. Such rules are not concerned primarily with judicial administration . . . and may affect substantially the obligations of the parties under the contract." *Restatement* § 140, Comment c. We accordingly apply South Dakota rather than Minnesota law in resolving the parol evidence question.[9]

In South Dakota the parol evidence rule is of statutory origin: "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." S.D. Compiled Laws Ann. § 53–8–5 (1967). A related statute governs oral communications occurring after a written contract is executed: "A contract in writing may be altered by a contract in writing without new consideration or by an executed oral agreement, and not otherwise." S.D. Compiled Laws Ann. § 53–8–7 (1967).

The South Dakota Supreme Court has authoritatively construed Section 53–8–5 as follows:

[W]here a contract which has been reduced to writing and executed by the parties is complete, clear, and unambiguous in its terms and contains mutual contractual covenants, or where the consideration consists of a specific and direct promise to do or not to do certain things, this part of the contract, in the absence of fraud, mistake, or accident, cannot be changed or modified by parol or extrinsic evidence, nor can new terms be added to the contract, nor to the contractual consideration therein expressed, nor, where all these facts exist, may a party to a contract show that he was induced to sign

8. *Restatement* Section 187 in substantial part reads:

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

On the facts of this case, there is no basis for upsetting the parties' choice of South Dakota law.

9. Under the rule of *Klaxon Company v. Stentor Electric Manufacturing Company, Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), we must of course apply Minnesota conflict-of-laws rules with respect to the state law contract claims before us. Our research does not disclose that the Minnesota Supreme Court has had occasion to consider the principle stated in *Restatement* Section 140. However, Section 140 is premised upon the widely accepted view that the parol evidence rule is a rule of substantive law, a premise with which the Minnesota Supreme Court agrees. *Anchor Cas. Co. v. Bird Island Produce, Inc.*, 249 Minn. 137, 82 N.W.2d 48, 54 (1957). In the absence of any contrary indication, we accordingly conclude that the Minnesota Supreme Court would, if confronted with the issue, agree with *Restatement* Section 140.

the contract by the making of a prior or contemporaneous oral agreement, where such showing would be tantamount to adding to or subtracting from the contractual consideration expressed in the written contract.

*Baker v. Jewell*, 77 S.D. 573, 96 N.W.2d 299, 301–02 (1959); *Kindley v. Williams*, 76 S.D. 225, 76 N.W.2d 227, 229–30 (1956). In the absence of fraud, mistake or accident, it is presumed that the written agreement expresses the final intention of the parties upon the subject matter of the contract. *Northwestern Pub. Serv. Co. v. Chicago & N. W. Ry. Co.*, 87 S.D. 480, 210 N.W.2d 158, 160 (1973).

Although some aspects of the parole evidence rule are, in South Dakota and elsewhere, recurring sources of controversy, it is well-established that oral negotiations or agreements which preceded execution of a written contract may not, at least ordinarily, be employed to contradict and nullify its express terms. *Eggers v. Eggers*, 79 S.D. 233, 110 N.W.2d 339, 342 (1961); *Kindley v. Williams, supra*, 76 N.W.2d at 230. And in South Dakota the same rule is statutorily prescribed with respect to unexecuted oral agreements made *after* execution of a written contract. S.D. Compiled Laws § 53–8–7 (1967), quoted *supra*.

Turning first to the Dakota 16 controversy, we conclude that the challenged parol evidence is inconsistent with the written partnership agreement. Mueller was permitted to testify to statements allegedly made by McNeal that McNeal would call plaintiffs before purchasing any cattle at breakevens higher than forty-five cents per pound. Paragraph 5 of the written agreement provided that the partnership "shall purchase" an aggregate of 2,000 feeder cattle and calves, and paragraph 8 vested exclusive management authority in Hubbard. Most significantly, paragraph 17 specified: (1) "No Limited Partner shall participate in the control, operation or management of the Partnership business"; and (2) "The Limited Partners hereby consent to any purchase . . . by the General Partner on behalf of the Partnership, of any or all

property now or hereafter acquired for the Partnership, *on such terms and conditions as may be determined by the General Partner.* . . ." (Emphasis supplied). These provisions make abundantly clear that under the agreement as written Hubbard had no contractual obligation to purchase cattle at any particular price. Mueller's testimony, which purported to establish that Hubbard did have such a contractual obligation, directly contradicted the writing and should accordingly have been excluded insofar as plaintiffs' contract claims are concerned.

We reach the same conclusion with respect to the Dakota 14 contract claims. The critical dispute on these claims concerns the "best efforts" clause contained in the December 1973 Supplementing Agreement. Again, the pertinent portions of Mueller's testimony and the pertinent provisions of the written agreement, both of which are set out in considerable detail *supra*, are fundamentally inconsistent.

Mueller was permitted to testify about discussions he allegedly had with McNeal in which the two of them considered inserting a "stop-loss" or "guarantee" provision in the agreement to the effect that plaintiffs would not lose more than one hundred dollars per head on their Dakota 14 investments. This testimony could well have left the jury with the impression that McNeal had promised Mueller everything short of an actual guarantee, and indeed, that the only reason the written agreement did not in terms contain a guarantee was that "it really fouled up the lawyers to ask them to write all these things in." The written agreement, of course, contained no guarantee, but it did contain the "best efforts" clause. If the agreement were otherwise silent as to the intended meaning of the words "best efforts", plaintiffs might convincingly argue that Mueller's testimony would be admissible for the purpose of explaining, in consistent additional terms, the intended meaning of the uncertain or ambiguous words "best efforts." But that is

not the issue before us, and we do not pass on it.[10]

In determining whether language in a written contract "is reasonably capable of being understood in more than one sense" and therefore susceptible to interpretation by parol, the courts will not examine the contractual provisions in isolation. *Ponderosa-Nevada, Inc. v. Venners*, 243 N.W.2d 801, 804 (S.D.1976). "It is a fundamental rule of contract construction that the entire contract and each and all of its parts and provisions must be given meaning if that can consistently and reasonably be done." *Id.* Here, the Supplementing Agreement was *not* otherwise silent as to the intended meaning of the words "best efforts." Rather, it stated in numerous places, twice in conspicuous language, that Hubbard was in no position to predict future cattle prices and that plaintiffs' losses could be substantial. It also cautioned that advance contracting of cattle might not be possible. In short, it made clear that the venture was a risky one. Thus, the written agreement as a whole necessarily foreclosed the possibility that "best efforts" could be understood or construed to mean anything even remotely approximating a guarantee. *See id.* For that reason the agreement should have spoken for itself, and Mueller's testimony should have been excluded insofar as plaintiffs' contract claims are concerned.

Plaintiffs seek to avoid application of the parol evidence rule by suggesting, first, that Mueller's testimony is admissible to establish the existence of an oral agreement that is collateral to the written agreement, and second, that Mueller's testimony is admissible to establish the consideration for the written agreement. A collateral oral agreement will not, however, suffice to avoid application of the parol evidence rule where it is, as here, inconsistent with the written contract. *Eggers v. Eggers, supra,* 110 N.W.2d at 342; *Moncur v. Jones,* 72 S.D. 202, 31 N.W.2d 759, 764–65 (1948); *Barnes v. Hill City Lumber Co.,* 34 S.D. 158, 147 N.W. 775, 777 (1914); *In re Roberts,* 358 F.Supp. 392, 396–97 (D.S.D.1973) (applying South Dakota law); 30 Am.Jur.2d *Evidence* § 1049 (1967). As to the consideration theory, the South Dakota Supreme Court held in *Farmers' Elevator Co. v. Swier,* 50 S.D. 436, 210 N.W. 671, 673 (1926):

> One exception [to the parol evidence rule] frequently invoked is that recitals as to the consideration of a written instrument are not conclusive, and that it is competent to inquire into the consideration and show by parol or other extrinsic evidence what the real consideration was. This exception, however, has no application where the statement in a written instrument as to consideration is of a contractual nature and consists of a specific and direct promise to do certain things.

*See also Independent Harvester Co. v. Anderson,* 45 S.D. 60, 186 N.W. 112, 114–15 (1921).

There can be little doubt that the admission of parol evidence on both the Dakota 14 and Dakota 16 contract claims was not only erroneous but also prejudicial. Even with the parol evidence, Hubbard presented a strong defense to the contract claims, and plaintiffs' counsel pointedly emphasized the pivotal nature of the parol testimony during closing argument. We cannot, therefore, deem the error harmless.[11]

We point out that it is well-established in South Dakota that parol evidence is admissible to prove fraud;[12] in cases where fraud

---

**10.** *Compare Dail v. Vodicka,* 237 N.W.2d 7, 9 (S.D.1975), *and Habeck v. Sampson,* 221 N.W.2d 483, 486–87 (S.D.1974), (language of written contract ambiguous or uncertain), *with Eggers v. Eggers, supra,* 110 N.W.2d at 341–42, *and Hobbs v. Whitelock,* 57 S.D. 198, 231 N.W. 904, 907 (1930), (language of written contract not ambiguous or uncertain). *See generally* 30 Am.Jur.2d *Evidence* §§ 1069–71, 1074 (1967).

**11.** It is questionable whether, had the trial court properly excluded the parol evidence as to the contract claims on Dakota 16, sufficient evidence would have remained to warrant submission of those claims to the jury. Because we conclude that a reversal is necessary, however, we do not resolve this issue. If the case is retried, the district court will of course be free to consider it.

**12.** The South Dakota Supreme Court has in this context rejected the distinction between fraud in the execution and fraud in the induce-

is proved, however, the proper remedy is voiding the contract or damages for fraud, not recovery on the contract. *Sabbagh v. Professional & Business Men's Life Ins. Co.*, 79 S.D. 615, 116 N.W.2d 513, 520–21 (1962); *Baker v. Jewell, supra*, 96 N.W.2d at 302–03. While the parol evidence here is admissible to prove fraud, it remains inadmissible to prove breach of contract. *Baker v. Jewell, supra*, 96 N.W.2d at 303. As already noted, an appropriate limiting instruction was requested and refused. See note 7, *supra.*

### III.

■ There remains for consideration the troublesome issue of what effect the erroneous and prejudicial admission of parol evidence on the contract claims should have on the *general verdicts* returned by the jury. On the facts of this case, we conclude that the verdicts must be set aside.

As noted at the outset of this opinion, Hubbard requested a special verdict by which the jury could have made known which theory or theories of liability were supported by the evidence. The request was denied.[13] Instead, the cause was submitted to the jury under the following general instruction, as requested by the plaintiffs:

> Plaintiffs have set forth a single set of facts, with four legal theories each as to why the evidence entitles them to relief from some or all of their losses in connection with Dakota 16 and Dakota 14. Those theories, about which I will soon give you more detailed instructions, are: breach of contract, breach of fiduciary duty, misrepresentation and concealment,

---

ment and allows parol evidence to prove either. *Baker v. Jewell, supra*, 96 N.W.2d at 303–04.

**13.** It is settled that submission of a special verdict to a federal jury is a matter of procedure governed by the federal rules and not by state practice. *Lowery v. Clouse*, 348 F.2d 252, 260 (8th Cir. 1965). Under Rule 49(a), Fed.R. Civ.P., submission of a special verdict is permissive and not a matter of right, and it is discretionary with the trial court. *Id.;* 5A J. Moore *Federal Practice* ¶ 49.03[1] at 2208 (1977).

and a fraudulent course of conduct in connection with a sale of securities. If you determine that the plaintiffs are entitled to recover on any of these theories in connection with Dakota 16 or Dakota 14, you will then determine the damages of each plaintiff in accordance with the instructions I shall give you and render a verdict for plaintiffs in the amount you determine is proper. If you find that the plaintiffs are entitled to relief on none of the theories they assert, then you will render verdicts for the defendant.

The insurmountable difficulty is that the general verdicts returned by the jury under this instruction may rest solely upon the contract claims, which are tainted with the trial court's erroneous and prejudicial admission of parol evidence.

A similar problem was recently analyzed by Judge Friendly for the Second Circuit in *Morrissey v. National Maritime Union*, 544 F.2d 19 (2d Cir. 1976). At issue in that case were, *inter alia,* distinct claims under Sections 101(a)(2) and 101(a)(5) of the Landrum-Griffin Act, 29 U.S.C. §§ 411(a)(2) & 411(a)(5). After concluding that the district court had erred in submitting the Section 101(a)(5) claim to the jury, the Second Circuit went on to hold that a general verdict on the two claims could not stand. We quote a substantial portion of the analysis:

> The general rule is that when one of the two claims that have been submitted to the jury should not have been submitted, a general verdict, such as was rendered here on the LG [Landrum-Griffin] claims, cannot stand. *United New York and New Jersey Sandy Hook Pilot Ass'n v.*

---

We do not hold that the trial court's refusal to submit the special verdict here was an abuse of discretion, much less that such refusal by itself constituted reversible error. But we do suggest that cases such as this, where multiple theories of liability are asserted, are the ones most suited to the use of special verdicts, because special verdicts will often obviate the necessity of deciding difficult legal questions which are not essential to an appropriate disposition of the controversy.

*Halecki,* 358 U.S. 613, 619, 79 S.Ct. 517, 520, 3 L.Ed.2d 541 (1959); *Patton v. Wells,* 121 F. 337, 340 (8th Cir. 1903); *Fatovic v. Nederlandsch-Ameridaansche Stoomvaart,* 275 F.2d 188, 190 (2 Cir. 1960). The language used is generally quite absolute ("a new trial will be required, for there is no way to know that the invalid claim . . . was not the sole basis for the verdict"—*Halecki;* "[s]ince we cannot determine from the general verdict . . . whether they relied upon a proper or improper claim . . . we must reverse the judgment and order a new trial"—*Fatovic* ). However, a few recent cases have disregarded the error when the appellate court was fairly convinced that the jury proceeded only on the sound ground. In *Collum v. Butler,* 421 F.2d 1257 (7 Cir. 1970), a § 1983 action for police brutality, the trial court charged that recovery might be had if the police had beaten the plaintiff or had kept him from contacting counsel or family. The court of appeals held that § 1983 would not cover the latter point, in the absence of unusual circumstances not there shown, but that plaintiff's judgment should be affirmed. The dominant issue at trial had been the physical abuse, and that was the only issue on which damages had been proven; the other issues had been of "such relative insignificance" that the result "would not have been substantially affected if these issues had not been submitted," 421 F.2d at 1260. *Gardner v. General Motors Corp.,* 507 F.2d 525, 529 (10 Cir. 1974), is to much the same effect. See also *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832, 837–38 (2 Cir. 1967).

Assuming these cases to have been soundly decided, we think the qualification on the general rule of *Halecki* and other cases must be kept within rather strict bounds. Here we find no sufficient basis for confidence that the verdict on the LG count would have been rendered, and particularly that the same verdict would have been rendered, if the complaint under § 101(a)(5) had not been submitted.

544 F.2d at 26–27 (citations omitted in part).

We are in agreement with the above analysis, which is decisive here. First, there is no material distinction between a situation, like that in *Morrissey,* in which one of several theories of liability should not have been submitted to a jury at all, and a situation, like that here, in which one of several theories of liability is not sustainable because of an erroneous and prejudicial admission of evidence. The essential inquiry in either case is whether the appellate court is fairly convinced that the jury proceeded on a sound basis. Second, we are unable to say with any confidence that the verdicts returned below rested on anything other than the contract claims. Plaintiffs' counsel stated in closing argument: "Our principal focus has been on the contract claims, the promises that John McNeal made . . . ." A careful review of the record convinces us that all of plaintiffs' theories were of marginal validity at best and that the contract theory might well have provided the sole basis for the verdicts.

IV.

■ What has heretofore been said is sufficient in itself to warrant a new trial on all issues. We are also of the view that the trial court erred in not granting a new trial on all issues on the ground that the verdicts were the result of passion and prejudice on the part of the jury. Such issue was raised by timely motion for new trial.

The trial court points out that on Dakota 16 plaintiffs concede that Mueller and Devane asked for only $219,300 and $38,700 respectively, which represents the total amount of their investment in Dakota 16 and that no proof was offered in support of any greater amount. The verdicts exceed the amounts claimed by Mueller and Devane by $186,400 and $32,895 respectively. The court denied a mistrial as to Dakota 14 but granted a new trial as to Dakota 16 unless remittitur down to the amount claimed was filed. Such remittitur was filed.

The trial court states that it is impossible to know why the jury awarded such grossly excessive verdicts. We agree. The court ultimately determined that the excessive verdicts were not the result of bias, prejudice or reckless disregard but were due to an honest mistake and that the error could be corrected by remittitur to the maximum amount claimed. We do not agree with such determination. The large excess in itself and the absence of any plausible explanation therefor clearly points to bias and prejudice on the part of the jury. Such conclusion is strengthened by the fact that the jury not only filled in the appropriate verdict blanks with an excessive amount but added in writing "plus damages of $51,000" as to Mueller and "plus damages of $9,000" for Devane. There is nothing in the court's instructions or the evidence which would warrant adding the plus amounts to the verdicts. The issue of punitive damages was not submitted to the jury. Such added damages in our view can only be explained on the basis of bias, passion or prejudice on the part of the jury.

We recognize that in many situations excessive verdicts can be cured by an appropriate remittitur. However, we cannot say under this record that an impartial jury, in event it found liability, would award the full amount claimed by the plaintiffs on Dakota 16.

The jury's award on the Dakota 14 claim was well within permissible limits. Plaintiffs have not made out a strong case of liability on either Dakota 14 or 16. Both claims were tried to the same jury. The passion and prejudice which led to the grossly excessive verdict on Dakota 16 may well have influenced the jury on the liability issues on both Dakota 14 and 16.

Accordingly, the verdicts returned below are set aside and the judgments entered on those verdicts are vacated. Plaintiffs' cross-appeal seeking prejudgment interest is dismissed without prejudice. The cause is remanded to the district court for further proceedings not inconsistent with this opinion.