ENGINE SPECIALTIES, INC., et al.,
Plaintiffs-Appellees,

v.

BOMBARDIER LIMITED et al.,
Defendants-Appellants.

No. 78–1492.

United States Court of Appeals,
First Circuit.

Argued March 15, 1979.

Decided July 25, 1979.

John Vanderstar, Washington, D. C., with whom John D. Taurman, Covington & Burling, Paul B. Galvani, Washington, D. C., Ropes & Gray, Boston, Mass. and Paul V. Donahue, Pittsfield, Mass., were on brief for Bombardier Ltd., et al.

Thayer Fremont-Smith, Boston, Mass., with whom Robert S. Frank, Jr., Wm. Shaw McDermott, James A. McDaniel and Choate, Hall & Stewart, Boston, Mass., were on brief for Engine Specialties, Inc.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, PETTINE, District Judge.*

BOWNES, Circuit Judge.

On January 4, 1971, Engine Specialties, Inc. (ESI) sued Bombardier Limited (Bombardier) for tortious interference with ESI's contractual relationship with Agrati-Garelli (Agrati) and for violating sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2 which proscribe restraint of trade and attempted monopolization. ESI is a Pennsylvania corporation; Bombardier, a Canadian; and Agrati, an Italian corporation. An injunction, treble damages and attorney fees were sought pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. On January 30, 1971, ESI moved to amend its complaint by adding an allegation of a violation of section 7 of the Clayton Act, 15 U.S.C. § 18.[1] Durham Distributors, Inc., an ESI distributor for the New England states, moved to intervene as a plaintiff in July, 1971; in the absence of

---

* Of the District of Rhode Island, sitting by designation.

1. Both the Sherman § 2 and the Clayton §§ 16 and 7 claims were dropped prior to submitting the case to the jury.

any opposition, the motion was granted in August, 1971. On September 1, 1971, the district court issued a preliminary injunction against Bombardier. The court's opinion is reported at 330 F.Supp. 762. We affirmed, 454 F.2d 527. The district court granted the injunction after determining that ESI was likely to prevail on the merits of its tort claim, but specifically reserved opinion on the antitrust claims. ESI moved for a contempt citation against defendant on February 23, 1972, after Bombardier had allegedly violated the injunction which had been clarified by the district court in November, 1971, and January, 1972. Following a hearing, the court found that defendant had willfully violated the injunction and ordered damages and costs, including reasonable attorney fees to plaintiff. On September 6, 1972, the district court allowed plaintiffs' motion to join Bombardier East, Inc., defendant's wholly-owned Massachusetts subsidiary, and, on January 5, 1973, permitted Watercraft Sales Center, Inc., an ESI distributor in Michigan and parts of Indiana, to intervene as a party plaintiff. For purposes of our discussion, we will use the terms "Bombardier" to include both defendants, and "ESI" to encompass plaintiffs ESI and its two distributors, Durham Distributors, Inc. and Watercraft Sales Center, Inc.

On March 14, 1977, after a five week trial, the jury found for all plaintiffs against both defendants on liability, and on April 13, 1977, the same jury awarded damages to ESI of $85,000 for tortious interference with contractual relationships and $400,000 for the antitrust claims, and antitrust damages to Durham of $102,000 and Watercraft of $20,000. The antitrust damages are subject to trebling. 15 U.S.C. § 15.

### FACTUAL BACKGROUND

Since much of the factual background has already been reported in the opinion by the district court and by this court's affirmance, see 330 F.Supp. 762 and 454 F.2d 527, we sketch only those facts necessary for an understanding of the issues on appeal. The facts, and all reasonable inferences drawn

therefrom, will be viewed in the light most favorable to ESI, the party prevailing in the proceedings below. Anderson v. Iceland S.S. Co., 585 F.2d 1142, 1150 (1st Cir. 1978).

In 1967 and 1968, ESI and Agrati entered into an agreement providing that ESI would act as sole distributor for Agrati-manufactured minicycles in North America. The minicycles were made to ESI's specifications and were sold by ESI under the name "Broncco." The terms of their agreement provided that either party could terminate upon six months' notification. It further provided that if Agrati terminated the contract, it could not market, sell or supply the Broncco, either directly or indirectly, in North America for a period of two years following the contract's termination. In March, 1970, ESI and Agrati modified their agreement providing that if a default of the prior agreement occurred and continued for a period of twenty days, then the earlier agreement would terminate without further action on either's part and that Agrati would be free of the restriction with respect to the sale of the Broncco in North America.

Bombardier, the world's largest manufacturer of snowmobiles, was interested in developing a summertime product which its extensive distributor and dealer network could market during the offseasons. Starting in 1969, it began to explore the possibility of entering the minicycle market and developed a minibike called the "Fun-Doo." However, since Bombardier was not entirely satisfied that the Fun-Doo would do well in the marketplace because of the type of transmission it had, Bombardier in 1970 corresponded with Czech, Taiwanese and Japanese manufacturers with the aim of arranging the foreign manufacture of minicycles for Bombardier. In August, 1970, Agrati met with Bombardier in Canada and discussed various proposals for the distribution and/or manufacture of minicycles. During this meeting, Bombardier informed Agrati that a decision would have to be reached quickly since, otherwise, Bombardier would consider manufacturing a product of its own. On September 13, 1970, Bombardier

met in Italy with Agrati and discussed the problems posed by Agrati's contract with ESI, which made ESI Agrati's sole distributor in North America and which forbade the sale by Agrati of the Broncco for a period of two years in the event that Agrati terminated the contract. On September 16, a meeting with representatives from ESI, Bombardier, and Agrati took place at Agrati's plant in Milan. Bombardier's interest in displacing ESI was made known and suggestions were proposed to ESI that in exchange for relinquishing its exclusive dealership it could be made a dealer for Bombardier and that Bombardier might invest in ESI. Agrati emphasized to ESI that Bombardier would come into the market independently if an agreement could not be arranged and that, because of Bombardier's size, it would overwhelm the competition. ESI maintained that its contract with Agrati would have to be honored and refused the proposals made by Bombardier. It was then decided between Bombardier and Agrati that Agrati would send the six month termination notice to ESI. It was also agreed between Bombardier and Agrati that, because of the six month lag, Bombardier would put its own Fun-Doo on the market that year. The remainder of Bombardier's visit with Agrati centered around plans for circumventing the two year proscription contained in ESI's contract.

During October, Bombardier became increasingly dissatisfied with the capabilities of its Fun-Doo and decided to pursue discussions with Agrati to push ahead with a joint venture between the two companies, whereby Bombardier and Agrati would form a company on a 60/40 basis, with Bombardier in control. Bombardier also inquired as to whether Agrati had sent the cancellation notice to ESI, which, in fact, Agrati had done.

On October 16, 1970, Agrati advised ESI that it had failed to open certain lines of credit and that this was a breach of contract. No mention was made of the twenty day provision allowing cancellation of the contract if said alleged breach remained in effect for the prescribed period. On October 19, an intervening phone call from Agrati was construed by ESI to constitute a waiver of the alleged breach.

No contract provision called for the establishment of the line of credit within the time demanded by Agrati. By letter of October 26, ESI informed Agrati that (1) it had until May, 1971, to fulfill its contract commitment to purchase 3,000 vehicles; (2) ESI had agreed with Agrati in August, 1970, to postpone the Fall shipments because of Agrati's late shipments earlier in the year; (3) Agrati's call of October 19, wherein Agrati agreed to change the shipping schedule, had superseded Agrati's letter of October 16 which had claimed default on the part of ESI. ESI's position on these matters was made known to Bombardier by Agrati during the November meetings in Philadelphia, see below, and its October 26 letter discussed. Notwithstanding this, Bombardier and Agrati agreed to claim default by ESI and terminate ESI's contract.

On November 4 and 5, Agrati met with Bombardier in Philadelphia, with Agrati's American counsel. At this meeting, the 1968 and 1970 contracts with ESI were discussed (Agrati provided copies of all the agreements to Bombardier for its examination) and it was decided that Agrati would claim that ESI had breached the contract and had failed to remedy the breach for a period of twenty days, thus resulting in termination of the contract. On November 6, after a telephone call during the Philadelphia meeting to Agrati in Italy, a cable was sent by Agrati to ESI demanding that a line of credit be set up. The cable also "reminded" ESI of the contract termination which was to occur on May 20, 1971.[1a] No mention whatsoever was made of the immediate breach should ESI fail to establish the demanded lines of credit within twenty days. During the Philadelphia meetings, Bombardier proposed to Agrati that it share the costs which Agrati might incur as damages resulting from its termination of the

---

1a. As provided by the contract, either party could cancel with six months notice to the other. Agrati had sent notice to ESI in November, 1970. *See* discussion *supra* at 3–4.

ESI contract. This action was taken in an attempt to assuage Agrati's concern that it might be sued by ESI for breach of contract. Bombardier was encouraged by the 1970 contract, of which it had previously been unaware, providing for termination in case of a breach continuing for twenty days. Armed with the perceived ability to avoid the ESI contract free of the two year proscription, Bombardier urged Agrati to insist on a default as soon as the twenty day period for opening the lines of credit referred to in Agrati's October 16 letter expired. On November 25, Agrati notified ESI that the contract was terminated.[2]

Bombardier travelled to Italy for meetings running from November 12 through November 18. An agreement was finalized incorporating the parties' understanding arrived at during the Philadelphia meetings. It was agreed that Agrati would deliver immediately[3] to Bombardier Broncco minicycles and parts if and when ordered. Also reduced to writing was Bombardier's agreement to compensate Agrati for damages arising from any future lawsuit for breach of contract with ESI. The two agreements were initialed by both parties on November 14. Part of the agreement was that a European holding company would be organized to actually perform Agrati's functions. Later, this conceit was dropped and Agrati was recognized as the real party to the contract.

The contract which served as the basic operating agreement between Bombardier and Agrati at first envisioned a joint venture, whereby a Canadian company would be formed to assemble and/or manufacture and/or sell certain designated motorcycles. Bombardier was to act as the sales agent for the newly formed Canadian company.[4] The agreement forbade either Bombardier or Agrati from manufacturing, assembling, or acting as sales agents other than in the manner described above. In the event that either Bombardier or Agrati developed and finalized a completely new product in the motorcycle field, it would be offered in the following manner: (a) if developed by Agrati and in the range of 50cc. to 100cc., it would be offered to Bombardier for sale and manufacture in North America; (b) if developed by Bombardier and in the range over 100cc., it would be offered to Agrati for sale and manufacture through its motorcycle distribution organization, but Bombardier would have the right to sell it through its own distribution network outside North America. The contract further provided that Bombardier was to act as the exclusive agent for Agrati in the North American market. The term of the contract was for an initial period of five years.

On December 1, the Assistant to the President in charge of Bombardier's minicycle project called ESI under the guise of wanting to become an ESI distributor. During this phone conversation, Bombardier ascertained ESI's inventory, pricing and other information on the Broncco. In January, 1971, Bombardier notified its sales and advertising personnel that it was now marketing the Agrati minicycle under its own label. The notice informed them that ESI would no longer have the Broncco in its line of minicycles and stated that, whereas ESI had been pricing the Broncco at $344.95 without lights, Bombardier would market its minicycle at $339.95 with lights.

During the Spring of 1971, ESI, pursuant to its contract with Agrati, ordered spare

2. ESI submitted the question of breach of contract to arbitration, as required by the contract with Agrati. In June, 1973, the arbitration tribunal ruled that Agrati had breached the contract; ESI then obtained a suspension of arbitration proceedings on the question of damages pending the outcome of the instant suit.

3. In the first draft of the agreement, Agrati had stated that it would not provide the Broncco for a two year period after May 20, 1971, thus acknowledging the terms of the 1968 contract with ESI. Bombardier demurred, stating that its understanding from the Philadelphia meeting was that Agrati would start shipping the vehicles immediately, since Agrati was going to declare a default by ESI. The terms were changed accordingly.

4. As events subsequently developed, the Canadian company, which was to be the joint venture link between Bombardier and Agrati, never materialized.

parts for vehicles already ordered. Agrati contacted Bombardier inquiring, in light of the fact that Bombardier was now Agrati's exclusive dealer in North America, about the possibility of Agrati's making direct delivery to ESI of the requested spare parts. Bombardier responded by saying that it wanted to supply the parts to ESI and that Agrati should forbear shipping any parts. Agrati then replied, after conferring with its attorney, that the terms of the 1970 agreement with ESI provided that, even in case of breach, spare parts would have to be shipped to ESI directly by Agrati for a period of six months following breach and that, since the termination of ESI occurred on November 25, 1970, Agrati's obligation would run until May 25, 1971.[5] Bombardier thereupon agreed to Agrati's making the delivery directly.

Bombardier, during the early months of 1971, released press announcements concerning its new line of minicycles featuring the Agrati engine. During a trade show in January, 1971, Bombardier people informed an ESI dealer that Bombardier had bought part of Agrati's stock, giving it a controlling interest in the firm and that the Broncco would not be available to the ESI dealer in the near future. And in the Summer, 1971, the ESI dealer reported that the local Bombardier dealer started selling the Bombardier equivalent to the Broncco. The loss of the exclusiveness of the Broncco product made the ESI dealer decide to give up the Broncco line during the 1971 season.

ESI's net profit before taxes was as follows:

for the fiscal year

| | |
|---|---|
| 1968 — | $19,078 |
| 1969 — | 35,527 |
| 1970 — | 63,809* |

(* $124,000 prior to extraordinary and nonrecurring expenses.)

ESI's supply line was terminated in November, 1970, two months into its 1971 fiscal year; losses for that year amounted to $261,000.[6] In 1972, ESI suffered a net loss of $816,000 and, for all practical purposes, went out of business.

### QUESTIONS ON APPEAL

The jury responded to special interrogatories, see Fed.R.Civ.P. 49(b), as set forth in the margin.[7]

---

**5.** ESI's position was that the contract was terminated on May 1, 1971, and that it, therefore, had a right to obtain parts from Agrati for six months thereafter. For all orders after May, 1971 Agrati insisted upon ESI's establishing a line of credit, for payment at time of shipment, rather than the previously prevailing policy of payment on a 120 day accepted draft whereby ESI had 120 days following the date of shipment to make payment.

**6.** This figure representing net loss to the company, included all sales of all products, not just the Broncco.

**7.** The jury's answers were as follows:
1. On count I, the jury's decision on the claim that Bombardier tortiously induced the termination of ESI's exclusive distributorship of Agrati-Garelli's minicycles is for the *Plaintiff.*
2. On count I, the jury's decision on the claim. that Bombardier tortiously adduced Agrati-Garelli to breach its contract with ESI is for the *Plaintiff.*
3. On count II, the jury's decision on the claim that defendants injured plaintiffs by conspiring with Agrati-Garelli not to compete is for the *Plaintiff.*

4. On count II, the jury's decision on the claim that Bombardier injured ESI by conspiring with Agrati-Garelli to eliminate ESI as a competitor is for the *Plaintiff.*
5. Did Bombardier purposely induce Agrati-Garelli to *terminate its business relationship* with ESI by unfair means or by violations of the antitrust laws such as are alleged in count II?
   Answer yes or no: *Yes*
6. Regarding ESI's claim that Bombardier purposely induced Agrati-Garelli to *breach its contract* with ESI, was there at the time of the alleged inducement a contract between ESI and Agrati-Garelli to which they were both bound?
   Answer yes or no: *Yes*
7. If yes to the previous question, did Bombardier know of ESI's rights under the existing contract and purposely induce Agrati-Garelli to breach it?
   Answer yes or no: *Yes*
8. Regarding plaintiffs' claim that Bombardier was a potential competitor of Agrati-Garelli, did Bombardier prior to November 14, 1970 have the intent and ability to market cycles like the "Fun-doo" of its own manufacture by the end of the summer of 1971?
   Answer yes or no: *Yes*

Bombardier argues on appeal that the court erred in not entering judgment notwithstanding verdict, or in the alternative, in not ordering a new trial and specifically raises the following points. (1) It alleges that ESI's claim that the agreement between Agrati and Bombardier constituted a division of markets and, hence, a per se violation under the Sherman Act fails for two reasons, first, that the agreement was merely a joint venture and thus not susceptible to the per se proscriptions of the Sherman Act, and, second, that ESI's injury resulted from the substitution of Bombardier as Agrati's distributor, a wrong not redressable under the per se rule. (2) Bombardier complains that ESI's antitrust claim that Bombardier and Agrati conspired to destroy ESI by unfair means, thereby lessening competition in a relevant market, lacked a sufficient evidentiary base for the jury to find either predatory conduct or impaired competition in a relevant market. (3) Bombardier urges that ESI's regional distributors, Durham and Watercraft, who were joined as plaintiffs, had no standing to press the antitrust complaint and that the damages for Durham lacked evidentiary support. (4) On the tort claim, Bombardier claims that the court erroneously applied Pennsylvania rather than Italian law and that, even under Pennsylvania law, the court erred in not instructing the jury that it had to find a purpose to cause harm. (5) Finally, Bombardier forwards the view that the court erred in finding a willful violation of the preliminary injunction and in awarding damages, lost profits, and attorney fees.

ESI has filed a cross-appeal in the event that we order a new trial on liability. The issues raised in the cross-appeal relate to damages and the court's limitations on the proof plaintiffs were allowed to adduce in support of its claims. ESI complains also of certain evidentiary rulings and jury instructions.

## THE LAW

### A. Conspiracy to Divide Markets

Section 1 of the Sherman Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal[.]" 15 U.S.C. § 1. As aptly stated by Mr. Justice Brandeis, however: "Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). In making this inquiry, the Court, over the years has identified certain behavior which by its very nature is destructive of competition; for this, the Court has fashioned per se rules. *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126,

9. Regarding the first of plaintiffs' two conspiracy claims, was injury to plaintiffs' business or property proximately caused by Bombardier's not entering the market with cycles like the "Fun-doo" of its own manufacture?

Answer yes or no: *Yes*

10. Regarding ESI's second conspiracy claim, did Bombardier and Agrati-Garelli conspire to drive ESI out of business and use unfair means to do so?

Answer yes or no: *Yes*

Note: Proceed to answer questions 11, 12, 13 and 14 only if the answer to question 10 is yes.

11. Did plaintiff's Broncco minicycle compete in a relatively broad submarket which included the Yamaha Mini-Enduro and Honda Trail '70?

Answer yes or no: *No*

12. If yes to the previous question, was competition in that submarket significantly lessened as a result of the conspiracy described in question 10?

Answer yes or no: _____

13. Did plaintiff's Broncco minicycle compete in a relatively narrow submarket which did not include the Yamaha Mini-Enduro and Honda Trail '70 but rather minicycles such as Indian, Yankee Boss and Premier BB?

Answer yes or no: *Yes*

14. If yes to the previous question, was competition in that submarket significantly lessened as a result of the conspiracy described in question 10?

Answer yes or no: *Yes*

31 L.Ed.2d 515 (1972); *United States v. Sealy, Inc.*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1950); *Fashion Originators' Guild v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927). For restraints of trade outside the narrow band of the inherently anticompetitive, the rule of reason applies. *Standard Oil Co. v. United States*, 221 U.S. 1, 60, 31 S.Ct. 502, 55 L.Ed. 619 (1911). *See National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

Our task is to determine into which of these two categories the complained-of behavior falls.

At the outset, we observe that joint ventures, without more, are judged against the standard of reasonableness rather than the per se rule. *United States v. Penn-Olin Co.*, 378 U.S. 158, 168–72, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964). However, the nomenclature "joint venture" does not automatically exempt a combination from the per se rule which is found to have elements inherently offensive to the antitrust laws.

> Nor do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a "joint venture." Perhaps every agreement and combination to restrain trade could be so labeled.

*Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598, 71 S.Ct. 971, 975, 95 L.Ed. 1199 (1951). Nor is it a per se violation to unilaterally grant an exclusive distributor-ship to a firm, even when that entails cutting off a former distributor. *See United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 376, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), *overruled on other grounds, Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 139 (2d Cir. 1978), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1979); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 76 and cases there cited (9th Cir. 1969), *cert. denied* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). If Bombardier's agreement with Agrati fits within the neat contours of these restraints, the correct analysis is whether, under the rule of reason, the restraint offends the antitrust laws. ESI alleges that the agreement between Bombardier and Agrati, in fact, constituted a division of markets and was not simply a joint venture or exclusive dealership. A division of markets between competitors at the same horizontal level [8] is a per se violation. *Continental T.V., Inc. v. GTE Sylvania, Inc., supra*, 433 U.S. at 58 n. 28, 97 S.Ct. 2549; *Topco Associates, supra*, 405 U.S. at 608, 609 n. 9, 92 S.Ct. 1126; *United States v. Sealy, supra*, 388 U.S. at 357 n. 5, 87 S.Ct. 847.[9]

The contract on its face envisioned a joint venture (which never came to fruition) and the appointment of Bombardier as Agrati's exclusive dealer. It did, however, include certain language which ESI reads as imposing territorial restrictions on Agrati and Bombardier. If, as ESI urges, those two companies are deemed to be operating at the same level in the market place, such an agreement would be illegal per se and the fact that the alleged territorial restrictions were linked to a joint venture cannot immunize it from the reach of the antitrust laws. *Timkin Roller Bearing Co. v. United States, supra*, 341 U.S. at 598, 71 S.Ct. 971.

---

**8.** Competitors operating at the same level of the market structure are considered horizontal competitors. *United States v. Topco Associates*, 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

**9.** For earlier cases holding that territorial allocations among horizontal competitors constituted per se violations of the antitrust laws see *United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 574 and cases there cited (2d Cir. 1961).

The first step in our inquiry is to ascertain whether Bombardier and Agrati can be deemed to have been operating at the same horizontal level in the market, thus triggering the per se rule should territorial restrictions be found.[10] Agreements not to compete among potential competitors as well as among actual competitors are forbidden. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 378, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). *Cf. Zenith Corp. v. Hazeltine*, 395 U.S. 110, 125–9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). *See also United States v. Pan American World Airways, Inc.*, 193 F.Supp. 18, 41 (S.D.N.Y.1961), *rev'd on other grounds*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963) (restraint of potential competitor constitutes violation of section 2 of the Sherman Act, 15 U.S.C. § 2). It must be shown, however, that the potential competitor—Bombardier—had the necessary desire, intent, and capability to enter the market at Agrati's level, *viz.*, manufacturing.[11] There is no dispute that Bombardier was not actually *manufacturing* minicycles at the time it entered into agreement with Agrati. But Bombardier had developed a prototype, called the Fun-Doo, and had indicated to Agrati that, if an agreement could not be worked out between them, Bombardier would press ahead with a product of its own. Bombardier stipulated that in the Spring, 1971, it had truthfully boasted there was "no part of a motorcycle that we [Bombardier] cannot produce." The jury specifically found that, prior to November 14, 1970, Bombardier had the intent and ability to market cycles by the end of the summer of 1971 of its own manufacture like the Fun-Doo.[12]

Our standard of review is whether there is sufficient support in the record for this jury finding. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696–7, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). If we can reach but one conclusion after reviewing the evidence and all inferences drawn fairly therefrom in the light most favorable to the plaintiff (the prevailing party) and if that conclusion differs from the jury's, only then can the finding be set aside. *Ibid.; Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d 986, 990 and cases there cited (1st Cir. 1978). Even if contrary evidence was presented and conflicting inferences could be drawn, it is for the jury to draw the ultimate conclusion, *Tennant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944), and such determination will not be disturbed unless the condition described above is met.

After reviewing the evidence in this light, we conclude that there was adequate record support for the jury's finding. Perhaps as telling a piece of evidence as existed was the stipulation by Bombardier itself that in 1971 it could produce all parts necessary for a motorcycle. The president of Bombardier, Beaudoin, testified that it was the agreement made between Agrati and Bombardier in November, 1970, which caused Bombardier to decide not to manufacture a product of its own in 1971. There was evidence that Bombardier had developed, manufactured, and tested the Fun-Doo in 1970. Beaudoin testified that the Fun-Doo

---

**10.** Bombardier on appeal attacks the application of the per se rule to the arrangement with Agrati since it claims that the per se rule has never been read to reach an arrangement between the two companies, one of which is not yet already established in the market. Bombardier failed to object to this aspect of the jury instructions. We cannot emphasize strongly enough that in the absence of plain error—and none is here found—a party should not attempt to undo on appeal what it failed to do at trial by way of jury instructions.

**11.** Bombardier was operating at the sales level; Agrati also, through its agent ESI, was operating at the sales level in North America. The agreement between Bombardier and Agrati contained language restricting competition between the two at both the sales and manufacturing level. See *infra* at 10–11 for specific agreement terms.

**12.** This determination is properly one of fact rather than law and was thus correctly submitted to the jury for its judgment. On appeal, Bombardier does not argue that the question whether Bombardier and Agrati were horizontal competitors—either actual or potential—should have been determined by the court as a matter of law rather than by the jury as a matter of fact.

was designed to appeal to the same segment of the population as the ESI model. In September, 1970, Beaudoin informed Bombardier's board of directors that the Fun-Doo, developed by Bombardier, would be placed on the market that year. It was acknowledged that Bombardier was interested in developing a summertime product for its distributors and had chosen the minicycle to fulfill this purpose; there was also testimony from Bombardier's motorcycle engineer that it had the manufacturing capacity in terms of engine facilities and equipment plant necessary to enter the motorcycle marketplace.[13] In October, 1970, Bombardier's marketing department drew up a production and sale schedule for the Fun-Doo, which called for all phases to be completed by the end of 1970. There was also testimony that at various junctures Bombardier had intimidated Agrati with the threat of entering the market immediately with its own minicycle if an agreement could not be worked out between them. These facts, viewed together, adequately underpin the jury's finding that Bombardier had the requisite intent and ability to enter the minicycle market on its own by the end of summer, 1971.

Having concluded that there is adequate record support for the jury's finding that Agrati and Bombardier were potential competitors at the manufacturing level, *compare United States v. Penn-Olin Co., supra,* 378 U.S. at 175, 84 S.Ct. 1710, we now analyze the language which ESI contends illegally divided markets. If we concur that the contract language embraced terri-

torial restrictions, the application of the per se rule would be appropriate.

The pertinent parts of the agreement[14] between Bombardier and Agrati provided:

6a) * * * [N]one of the parties hereto will manufacture and/or assemble nor act as agents for the sale of motorcycles in North America, either directly or indirectly, during the term of this agreement, with the exception of the products manufactured and sold by the company "Les Industries Bouchard Ltee" or under the trade-mark "Moto-Ski".

6b) * * * [I]n the event that Bombardier or Agrati-Garelli develops and finalizes a completely new product in the motorcycle field, this product should be mutually offered in the following manner:—if they are products developed by Agrati-Garelli (in the range 50cc. to 100cc.), they should be offered to Bombardier for sale and manufacture in North America;—if they are developed by Bombardier and are in the range of over 100cc., they should be offered to Agrati-Garelli for sale and manufacture through its motorcycle distribution organization, but Bombardier will keep the right to sell them through its own distribution organization outside North America. The offered party must advise in writing its decision to manufacture and market within one hundred and eighty (180) days, or forfeits its rights in this regard.

In case the offering party is not like [*sic*] to reach an understanding with the other party on the new products quantities the

---

**13.** Bombardier's chief motorcycle engineer who testified on this point also stated that Bombardier had no tooling or production experience in the motorcycle line. The jury was, nonetheless, entitled to weigh this remark against the other evidence and testimony indicating that Bombardier had the requisite production capability to manufacture its own minicycle product. In fact, the engineer testified that it had been his opinion in early 1971 that, while a great deal of work needed to be done in terms of production orientation, Bombardier had the potential of entering the marketplace.

**14.** The version cited in the text is that of Agrati's letter of February 23, 1971, to Bombardier

clarifying two earlier versions of the contract. The original contract was initialed by the parties in November, 1970, and was subsequently modified by Bombardier's letter of January 21, 1971, to Agrati and by Agrati's February 23, 1971 letter in response. Beaudoin, the president of Bombardier, accepted the amendments proposed by Agrati in its February 23 letter by letter dated February 23, 1971. The parties here stipulated that the written agreement of November 14, 1970, as modified by the two subsequent letters, was the basic operative document under which Bombardier and Agrati were doing business.

latter would be prepared to sell and/or manufacture, then the former is free to distribute directly worldwide such new products.

6c) Provisions contained in sub-paragraph b) herein above shall also apply to any motorcycles presently manufactured by Agrati-Garelli other than the minibike road model mini-bike motocross, and Junior Cross types as described in Appendix B of this agreement.

■ The jury specifically found that Bombardier and Agrati had conspired not to compete. We think that a fair reading of the above-quoted contract yields that finding. Paragraph 6a) is not offensive in and of itself: it purports to state merely that neither of the parties to the joint venture will compete with it by acting as agents for other parties. Paragraph 6b), however, limits the ability of both Agrati and Bombardier to compete: Agrati is foreclosed from selling or manufacturing any new motorcycle in the 50cc.–100cc. range within North America. Bombardier cannot manufacture any new product outside North America, although it retains the right to sell any product in the over-100cc. range through its own distribution network outside North America. Paragraph 6c) extends the restrictions of 6b to Agrati's existing lines, with the enumerated exceptions. In other words, Bombardier is free of Agrati's competition in both sales and manufacturing in North America and Agrati is free of Bombardier's competition in manufacturing outside North America. This, we think, rises to the level of a territorial allocation of markets.[15]

While Bombardier argues on appeal that the contract restrictions were simply incidents of a valid joint venture agreement, and thus reviewable under the rule of reason rather than the per se rule, such an approach must fail for two reasons. First, joint ventures which partake of behavior identified as inherently pernicious to competition such as price fixing or territorial allocations will be judged under the per se rule rather than under the rule of reason. The talisman of "joint venture" cannot save an agreement otherwise inherently illegal. *United States v. Sealy, supra*, 388 U.S. at 353, 87 S.Ct. 847; *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 823 and 826–31 (7th Cir. 1978), *cert. denied* 440 U.S. 980, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979). Secondly, in the context of this case, the argument that a joint venture can immunize inherently anticompetitive behavior from scrutiny under the per se rule is ineffectual since the parties agreed, in the amendments proposed by Agrati on February 23, 1971, and accepted by Bombardier, to form a joint venture only if, after study it appeared feasible to do so. That same amendment contained the restrictive language which has been cited above. In fact, the joint venture never materialized. It is clear, then, that the restrictive covenants were not mere incidents to a joint venture, but were substantive agreements in themselves, with an existence independent of the joint venture.

To sum up, the jury could properly have found that Bombardier had the requisite intent and ability to enter the market as a manufacturer of minicycles by the end of the 1971 Summer and that this, therefore, pitted Bombardier and Agrati against each other as potential competitors at the manufacturing level. The agreement entered into between the two potential competitors constituted a territorial allocation of markets such as to bring it within the ambit of per se prohibition. Our next task is to determine whether the fact of this conspiracy to divide markets caused the injury of which ESI complains.

---

**15.** Present here also was behavior directed at ESI which the jury found to be unfair and anticompetitive on the part of Bombardier. *Compare United States v. Penn-Olin Co.*, 378 U.S. 158, 176, 84 S.Ct. 1701, 12 L.Ed.2d 775 (1964); *Oreck Corp. v. Whirlpool Corp.*, 563 F.2d 54, 58 (2d Cir. 1977), *aff'd on rehearing*, 579 F.2d 126 (1978), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1979).

## B. *Was There Antitrust Injury?*

Bombardier contends that even were it found to be a potential competitor of Agrati and even had the two conspired to divide geographic markets, the injury sustained by plaintiff was unrelated to the alleged antitrust violation.[16]  In other words, did ESI's claimed harm flow from that which makes Bombardier's activity illegal, *i. e.*, the anticompetitive effect of the scheme to divide markets.  We look to *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), a case which, Bombardier argues teaches that the injury suffered by ESI is not compensable under the antitrust laws. Brunswick, the largest operator of bowling alleys, acquired several failing alleys which had defaulted in payments for equipment purchased from Brunswick, which was also one of the two largest manufacturers of bowling equipment in the United States. Competing bowling alleys brought suit alleging that Brunswick's acquisitions might substantially lessen competition or tend to create a monopoly in violation of section 7 of the Clayton Act, 15 U.S.C. § 18. Damages were sought pursuant to 15 U.S.C. § 15 for the reasonably expectable profits the plaintiffs would have earned had the failing alleys closed and the business which Brunswick picked up by operating them gone instead to plaintiffs.  The Court held that notwithstanding the existence of the section 7 violation, which was not contested before the Supreme Court, plaintiffs could not recover since the unlawfulness of the acquisitions was due to Brunswick's status as a "deep pocket" in a field populated by "pygmies" and there had been no showing that plaintiffs' injuries stemmed from an abuse by Brunswick of its deep pocket. The Court observed that plaintiffs would have suffered the exact same harm had the failing alleys been purchased by "shallow pocket" companies or obtained refinancing. *Id.* at 487–90, 97 S.Ct. 690.  The Court concluded,

> [F]or plaintiffs to recover treble damages on account of § 7 violations, they must prove more than injury causally linked to an illegal presence in the market.  Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.  The injury should reflect the anticompetitive effect either of the *violation* or of anticompetitive acts made possible by the violation.  It should, in short, be "the type of loss that the claimed violations  .  .  .  would be likely to cause."  *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. at 125, 89 S.Ct. 1562.

*Id.* at 489, 97 S.Ct. at 697.  (emphasis in original).

Bombardier contends that ESI's claims are like those of plaintiffs in *Brunswick, viz.*, it would have suffered the exact same injury had Agrati simply engaged in familiar switched-distributor behavior.  As we noted previously, unilaterally cancelling an exclusive distributorship and substituting another company does not rise to the level of a per se violation of the antitrust acts, irrespective of the harm thereby caused to

---

**16.** The analytical distinction between standing and antitrust injury is somewhat elusive.  At one point, Bombardier suggested that—even presuming that it had engaged in the illegal division of markets—ESI was not the proper party to be bringing suit, *i. e.*, that it lacked "standing" to sue.  The United States, it was suggested, was the proper party to sue.  We think that in the case before us the distinction between standing and antitrust injury is not vital to the result, but we do view the two as conceptually distinct.  As one commentator expressed it: "For example, the plaintiffs in *Brunswick*, as defendant's competitors, clearly had standing to challenge the acquisitions un-der the deep pocket theory; what was lacking was their inability to relate their claimed injury to the acquisitions' alleged *anticompetitive* consequences."  Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977*, 77 Colum.L.Rev. 979, 997 (1977) (emphasis in original).  For other discussions of this issue, *see Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163, 1168–69 (7th Cir. 1978); *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495 (9th Cir. 1977); *In Re Multidistrict Vehicle Air Pollution M.D.L., No. 31*, 481 F.2d 122, 125–30 (9th Cir.), *cert. denied sub nom. Morgan v. Automobile Mfg.*

the cancelled distributor.[17] Bombardier claims that whatever evil might have flowed from the purported illegal division of markets, ESI's harm was not causally linked to it.

Before we analyze the issue of antitrust injury in further depth, we think it instructive to note several key factors distinguishing *Brunswick* from the case at bar. (1) *Brunswick* was a section 7 case, 15 U.S.C. § 18; our case entails antitrust claims under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, with damages sought pursuant to 15 U.S.C. § 15. Section 7 is the antimerger section and speaks in terms of preventing future injury, *viz.*, mergers are prohibited where their effect "*may be* substantially to lessen competition, or to *tend* to create a monopoly." 15 U.S.C. § 18 (emphasis added). *See Brunswick, supra,* 429 U.S. at 485, 97 S.Ct. 690. Both sections 1 and 2 require a showing of *actual* harm by plaintiff. *See generally* Areeda, *Antitrust Violations Without Damage Recoveries,* 89 Harv.L.Rev. 1127, 1128–34 (1976). (2) Plaintiffs in *Brunswick* never proved that they had actually suffered any harm, but only that they had suffered defeat of their expectation of additional profits. Here, by contrast, plaintiffs suffered actual harm. (3) There was no proof of anticompetitive behavior by defendant Brunswick; there was such proof here. (4) In *Brunswick* there was no diminution of competition—

the failing businesses were revived by the defendant and the plaintiffs continued as healthy enterprises. ESI went out of business not long after the alleged injury. We note these distinctions between *Brunswick* and this case in order to focus more keenly on the specific issues we face. *See Ohio-Sealy, supra,* 585 F.2d at 832 n.16.

To determine the merits of Bombardier's *Brunswick* argument, we first note that plaintiffs here are entitled to have all the proof they adduced at trial viewed together, with an end toward proving their complaint. *See Continental Ore Co. v. Union Carbide & Carbon Corp., supra,* 370 U.S. at 698–9, 82 S.Ct. 1404. ESI introduced evidence that not only had Bombardier and Agrati illegally conspired to allocate markets between themselves, but, as a necessary consequence, had determined to eliminate ESI as a competitor at the same time. Because of its exclusive distributorship with Agrati, ESI stood in the way of the conspiracy's aim to allocate the sales market for minicycles to Bombardier.[18] *See Lee-Moore Oil Co. v. Union Oil Co. of Calif.,* 599 F.2d 1299 (4th Cir. 1979) (distributor whose contract was cancelled allegedly pursuant to conspiracy among producers has standing under section 4, 15 U.S.C. § 15, to allege *Brunswick*-type antitrust injury). Indeed, ESI was offered inducements for acceding to the conspirators' wishes and only after refusing to do so was cancelled.[19] Further-

Ass'n, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

17. For a case holding that cancellation of distributor at urging of competing distributor constitutes a per se violation by the manufacturer, see *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164 (3d Cir. 1979).

18. Although there is no allegation that Bombardier was a monopolist in the snowmobile business, it sold over 50% of the snowmobiles sold in the United States and had sales from all products of more than $160,000,000 plus an extensive dealer network in the United States and Canada. There is no gainsaying that Bombardier possessed the economic muscle to overwhelm ESI, whose sales in 1970 amounted to $727,320, and to induce Agrati to cooperate with it. *Compare George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc.,* 508 F.2d 547, 559

(1st Cir. 1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975).

19. At trial, ESI pressed a claim premised on *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), that the concerted action taken by the conspirators Agrati and Bombardier to induce ESI to comply with the plan to divide territorial markets constituted a violation. *See id.* at 45–47, 80 S.Ct. 503. ESI argued that the affirmative action taken in cancelling it following ESI's refusal to go along with the illegal plan constituted a violation under *Parke, Davis.* There was also the suggestion that the cancellation amounted to a concerted refusal to deal and thus illegal under *Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). As neither of these theories is advanced on appeal, we need not reach the question of their applicability.

more—and as the jury specifically found—Bombardier induced Agrati to terminate its contract with ESI by unfair or illegal means. ESI introduced evidence of Bombardier's threats to enter the market independently against the Agrati line unless Agrati agreed to do business with it. Bombardier urged Agrati to cut ESI off precipitously with no advance notice, thus depriving ESI of the opportunity to search for an alternate source of supply prior to termination. Bombardier then later attempted to dissuade Agrati from supplying parts to ESI which were contractually called for, even in case of cancellation. There was proof that Bombardier deliberately underpriced its Agrati cycle vis-a-vis the price of ESI's Broncco and that Bombardier used deceptive means for obtaining inventory, pricing and other information from ESI. In essence, as part of the territorial scheme, Bombardier worked to eliminate ESI as a viable competitive force in the minicycle market.[20] Bombardier had indicated to ESI distributors that they would no longer have exclusive rights to the Broncco and that Bombardier itself would soon be marketing the Agrati-made cycles. Bombardier released press statements that it would now be carrying the Agrati line. Had Agrati been free to sell in North America through its former distributor ESI, Bombardier could not have claimed exclusivity on the Agrati models nor intimidated ESI distributors with the threat of the loss of their exclusivity and their ability to obtain needed spare parts. The Court in *Brunswick* noted that plaintiffs there had failed to link their loss to the claimed antitrust violation (*i. e., Brunswick's* "deep pocket"), intimating that had proof of abuse of the deep pocket been introduced, the result would have been different. 429 U.S. at 490, 97 S.Ct. 690. Here, by contrast, plaintiffs introduced evidence of anticompetitive behavior by defendants, all linked to the antitrust evil. Plaintiffs need not prove that the antitrust violation was the sole cause of their injury, but only that it was a material cause. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., supra,* 585 F.2d at 833 n.17; *Foremost-McKesson v. Instrumentation Laboratory,* 527 F.2d 417, 420 (5th Cir. 1976). There was adequate evidence to support a finding that the territorial scheme, with its corresponding unfair and anticompetitive behavior aimed at ESI, was a material factor in plaintiff's injury.[21]

Bombarier argues ingenuously that the market division actually stimulated competition by introducing a potent force into the minicycle market. This disregards the fact that had Bombardier and Agrati not so conspired, there would have been *two* minicycles for the public to choose from—Agrati's Broncco and Bombardier's competing model, either the Fun-Doo or some other version—rather than the *one* which the conspiracy delivered up. This situation is thus not akin to that in *Brunswick* where competition was actually fostered by the continued presence of the once-failing businesses. Here, competition was curtailed, both as between Agrati and Bombardier and in that ESI was driven out of business and thus eliminated as a competitor.

Bombardier also contends that ESI's injuries would have been identical had Agrati

---

**20.** While much of this evidence also is probative of the so-called "Whitten" claim, 508 F.2d 547, alleging a section 1 violation, 15 U.S.C. § 1, *for intentional attempts to drive a competitor out of business by unfair methods with a concomitant impact on competition, all the evidence adduced at trial to prove antitrust violations should be viewed together as it relates to plaintiffs' claims. Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 698–99, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

**21.** Bombardier states that ESI was a mismanaged company and that the minicycle was in a state of decline and that these accounted for its demise. There may have been more than one cause of ESI's failure; plaintiffs had only to prove that defendants' behavior was a material cause of it. The jury found that defendants injured ESI by conspiring with Agrati not to compete and to eliminate ESI as a competitor. Based on a review of the pertinent evidence, we cannot say these findings lack record support. *See Ford Motor Co. v. Webster's Auto Sales, Inc.,* 361 F.2d 874, 885 (1st Cir. 1967).

merely switched distributors to a company such as Sears,[21a] an act which would not impute a per se violation of the antitrust laws. We are mindful of the danger articulated by Judge Frankel and fixed upon by defendants, namely, of converting a "garden variety" business tort into an antitrust violation. *Vogue Instrument Corp. v. Lem Instruments Corp.*, 40 F.R.D. 497, 499 (S.D. N.Y.1966). *See also George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc.*, 508 F.2d 547, 560 (1st Cir. 1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407 (1975). Our view of the etiology of this case convinces us that this is not being done here. There existed an array of misdeeds which "reflect[ed] the anticompetitive effect either of the violation or of anticompetitive acts [which were] made possible by the violation." *Brunswick, supra*, 429 U.S. at 489, 97 S.Ct. at 697. It was Bombardier's stance as an imminent potential entrant in the market which induced Agrati to succumb to Bombardier's blandishments. Had Agrati desired merely to switch the distributorship from ESI to Sears, there would have been no need to act as abruptly, cancelling the ESI contract in November, 1970, under the guise of a breach by ESI after lulling ESI into a false sense of security by having sent less than three weeks earlier a reference to the cancellation effective May, 1971. It was Agrati's desire to stave off an immediate threat of competition by Bombardier which spurred it to cancel ESI and then agree to the strategy of declaring a default in November. It was Bombardier's urgent desire to put a summertime product on the market forthwith which led to the sudden excising of ESI as Agrati's exclusive dealer. A company like Sears, lacking independent manufacturing capacity, could not have presented the same threat of competition to Agrati. Nor could it have presented the lure of foreclosing competition in the marketplace

as did Bombardier.[21b] This was a quid pro quo: Agrati would surrender its current dealership with ESI in exchange for the promise of no competition from Bombardier and Bombardier would exchange its ability to enter the market against Agrati in exchange for the exclusive dealership as well as a promise of no competition from Agrati. In short, it was Bombardier's position as an imminent competitor which impelled Agrati to accede to its demands. It strains reasonable expectations to believe that the trumped up charge of default would have been used had Agrati merely wished to switch distributors. Instead, Agrati would have used the contract term calling for termination on six months notice to either party and it would not have looked to Bombardier for an agreement to indemnify it for damages arising from a breach of contract action brought by ESI. Bombardier's status as a giant in the recreational vehicle field, its extensive network of dealers and distributors, and its expressed intentions to look elsewhere for a competing product should Agrati fail to reach an agreement with it led inexorably to the division of markets. And in order to accomplish the division of markets, it was necessary to deprive ESI of the Agrati product, which was done precipitously with no lead time thus depriving ESI of the opportunity to obtain its supplies from another source. The ineluctable result of the allocation of markets was that Agrati could no longer provide minicycles to ESI. *See United States v. Topco, supra*, 405 U.S. at 612, 92 S.Ct. 1126. We have here the type of *antitrust* injury which was found lacking in *Brunswick.*

C. *Need to Reach "Whitten" Claim—Effect on Damages Verdict*

■ ESI advanced two theories in support of its position that Bombardier had

---

**21a.** For purposes of this argument, it is assumed—and was argued below—that Sears lacks independent manufacturing capability.

**21b.** We do not understand Bombardier's argument to mean that, had Sears used the type of coercive tactics which had been employed by Bombardier, the mere fact that it lacked manu-

facturing capability could protect its behavior from the reach of the antitrust laws. *See Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979). Our analysis above is premised on the argument that, had Agrati unilaterally switched distributors to a company like Sears, ESI would have sustained the same injury.

violated section 1 of the Sherman Act, 15 U.S.C. § 1, and caused it injury. The first was the division of markets theory, discussed above. Because we have affirmed on that issue, we do not reach the *Whitten* claim. *See George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc., supra,* 508 F.2d 547. *See* n.20, *supra.* In boiled down format, the *Whitten* theory was argued to show that Bombardier had conspired with Agrati to eliminate ESI as a competitor in the minicycle market. ESI introduced evidence, much of which has been summarized above, to show unfair methods employed by Bombardier. The essential difference in proof between the *Whitten* and the division of markets theories is that the latter is a per se violation whereas the former, given our gloss, 508 F.2d at 561–2, is generally governed by the rule of reason. *Whitten* went to the jury here under the rule of reason, after ESI had introduced evidence to establish a narrow submarket and a lessening of competition therein. *See* Jury Answers to Interrogatories Nos. 11, 13, 14, *supra*, at n.7.

Bombardier made a fleeting suggestion in its brief that, since only one damage verdict was returned for both antitrust theories, the invalidity of either requires setting aside the damage award, citing two cases in support of its position, *North American Graphite Corp. v. Allan*, 87 U.S.App.D.C. 154, 184 F.2d 387, 389 (1950); *Dillon v. Barnard*, 328 Mass. 53, 101 N.E.2d 345, 346 (1951).[22] Since we are not reaching the *Whitten* issue, we examine whether liability premised solely on the division of markets claim is sufficient to uphold the antitrust damage award.

The measure of damages under both antitrust theories is the same. *Compare North American Graphite Corp. v. Allan, supra*, 184 F.2d 387 (measure of damages for breach of contract claim different from *quantum meruit* claim). *See also United States v. Algernon Blair, Inc.*, 479 F.2d 638,

641 (4th Cir. 1973). Both theories were pleaded in one count and the same facts permissibly adduced to prove both. *Compare Mueller v. Hubbard Milling Co.*, 573 F.2d 1029, 1030 & 1038–9 (8th Cir. 1978), *cert. denied*, 439 U.S. 865, 99 S.Ct. 189, 58 L.Ed.2d 174 (1979) (general verdict vacated where evidence impermissibly admitted as proof of contract breach, though admissible to prove fraud and impossible to determine on what basis jury grounded its verdict). This aspect of the case presented the jury with only *one* conspiracy in violation of section 1 of the Sherman Antitrust Act. ESI was entitled to present all the proof relating to the anticompetitive behavior to the jury "without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide, supra*, 370 U.S. at 699, 82 S.Ct. at 1410. Two theories were presented in support of plaintiffs' demand for relief. The court properly protected defendant against a double recovery for the same injury by instructing the jury that it was to return solely one damage verdict on the antitrust claim. No objection was taken to this element of the court's instruction: had Bombardier viewed itself as dangerously prejudiced by the failure of the court to request the jury to segregate its damages verdict for each of the theories, we do not understand its failure to bring this to the attention of the trial judge. *Compare Mueller v. Hubbard Milling Co., supra*, 573 F.2d at 1030 and 1038. Plaintiffs in fact highlighted this segment of the court's instruction as needing clarification, *viz.*, explaining to the jury that it should return a separate damages verdict on both the tort claim *and* the antitrust claim, even though it might find that plaintiff sustained the same injury under both the tort and the antitrust claims. We think defendant's failure to request a segregation of the damage verdict under each of the antitrust theories was not inad-

**22.** *Dillon v. Barnard* does not advance the cause of defendant any more than *North American Graphite Corp. v. Allan.* In *Dillon*, the court reversed the grant of defendant's motion for directed verdict on the grounds that the general verdict could be sustained only if shown that plaintiff was not entitled to go to the jury on either of the two counts. *North American Graphite* is distinguished in the text *infra*.

vertent, but rather the result of a clear-sighted tactical decision: by informing the jury that it should allocate damages between the two theories, there existed the strong possibility that the jury—which had already found defendant liable under both theories—would cumulate the damages and return a more substantial verdict.

This is not an instance of a jury's returning a general verdict on two separate claims where the reviewing court is unable to determine whether its verdict rested on a permissible rather than an impermissible ground. *Compare Morrissey v. National Maritime Union of America*, 544 F.2d 19, 26–7 (2d Cir. 1976); *Albergo v. Reading Co.*, 372 F.2d 83, 86 (3d Cir. 1966), *cert. denied*, 386 U.S. 983, 87 S.Ct. 1284, 18 L.Ed.2d 1284 (1967); *Fatovic v. Nederlandsch-Ameridaansche Stoomvaart, Maatschappij*, 275 F.2d 188, 190 (2d Cir. 1960). Here, the jury responded to interrogatories, *see* Fed.R. Civ.P. 49(b), and specifically found Bombardier liable under both antitrust theories. By upholding one of the theories, we need not reach the question of whether the jury was likewise correct in premising liability on the second. *Vareltzis v. Luckenbach Steamship Co.*, 258 F.2d 78, 80 (2d Cir. 1958). *Cf. Roy v. Star Chopper Co., Inc.*, 584 F.2d 1124, 1136 (1st Cir. 1978), *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979) (finding of liability under strict liability obviates necessity of finding liability under warranty count.)

D.  *Standing of Durham and Watercraft to Sue*

■ Defendant urges us to reverse the damage awards to ESI's distributors Durham and Watercraft for lack of standing to sue under section 4 of the Clayton Act, 15 U.S.C. § 15. Section 4 reads in pertinent part that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws

may sue therefor  .  .  .." Bombardier argues that neither Durham nor Watercraft is covered under this section.[23] The claims of Watercraft and Durham rest solely on the division of markets theory.

Watercraft and Durham were both ESI distributors of the Broncco; both rest their claims on the fact that ESI's exclusive distributorship with Agrati was terminated, resulting in their inability to obtain any further Broncco minicycles and having to compete with the Bombardier/Agrati cycle, with a consequent loss of sales. This injury does not bring them within the ambit of the protection of the antitrust laws. Watercraft and Durham were not the principal victims of the scheme to divide markets, but were innocent "bystander[s] who [were] hit but not aimed at[.]" *Perkins v. Standard Oil Co.*, 395 U.S. 642, 649, 89 S.Ct. 1871, 1875, 23 L.Ed.2d 599 (1969), quoting *Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358, 363 (9th Cir. 1955). Recovery of treble damages is potent ammunition intended not only to protect the aggrieved, but to deter the wrongdoer. The courts have attempted to keep the range of the barrage within the target area thought to have been intended by Congress in passing the antitrust legislation. *See e. g., Hawaii v. Standard Oil of Calif. Co.*, 405 U.S. 251 and cases cited at 262–3 n.14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163, 1168–9 (7th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979); *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495, 498–9 (1977); *Universal Brands, Inc. v. Philip Morris, Inc.*, 546 F.2d 30, 34–5 (5th Cir. 1977); *In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 125–31 and cases cited at nn.7, 8 and 9 (9th Cir.), *cert. denied sub nom. Morgan v. Automobile Mfg. Ass'n*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); *Calderone Enterprises Corp. v. United Artists Theatre Circuit,*

**23.**  The one paragraph of its brief which Bombardier devotes to the issue of whether Durham and Watercraft have standing cannot be said to have aided the court in its determination of the matter. We are also puzzled by the absence from the appendix of Bombardier's papers, filed with the district court on this issue. We assume that the motion papers and memoranda filed below contained a more detailed argument for opposing standing than the meager one advanced before us.

*Inc.*, 454 F.2d 1292, 1293–7 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). A principal concern has been to avoid duplicative recoveries. In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Court rejected the pleas of indirect purchasers that they be permitted to sue manufacturers for overpricing materials sold to them via the direct purchasers. The Court discussed the need to avoid "unwarranted multiple liability," *id.* at 730, 97 S.Ct. 2061, by limiting the right to bring suit to the direct purchasers.[24] Though *Illinois Brick* is not directly applicable here since it involved a narrow question concerning the offensive use of the "pass-on" rule, it does articulate the caution to be employed in assessing claims of parties who are removed from the alleged anticompetitive acts.

The conspiracy between Bombardier and Agrati to divide markets was not aimed at the market level at which Durham and Watercraft were operating. It was the particular configuration of facts whereby elimination of ESI as Agrati's distributor

was necessary to effectuate the territorial scheme which brought ESI so clearly within *Brunswick*. Watercraft and Durham argue their harms in terms of the loss of sales—due either to the loss of the Broncco or the loss of its exclusivity—because ESI was cut off by Agrati. Watercraft and Durham belong to that class "who have suffered economic damage by virtue of their relationships with 'targets' . . . rather than by being 'targets' themselves." *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., supra*, 454 F.2d at 1295. The *antitrust* injury was suffered by ESI alone, although the economic injury was suffered by all three plaintiffs. The conspiracy to divide markets was not directed at Durham and Watercraft's level, *i. e.*, distribution. The anticompetitive acts taken against ESI were directed solely at ESI as part of the scheme to divide territories and not at either of its two distributors. Although the natural result of depriving ESI of the Agrati product was to likewise deprive ESI's distributors of it, we think that the distributors lie outside the target area section 4 encompasses. *Ibid.*[25]

---

24. In *Reiter v. Sonotone Corp.*, —— U.S. ——, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), while confirming that consumers who pay higher prices as a result of illegal price fixing have sustained an injury to their "property" as that term is used in 15 U.S.C. § 15, the Court specifically reserved opinion as to whether the direct-purchaser rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), would bar recovery. In explaining the holding of *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), the Court stated that the "central premise" of that case was the Court's concern over "duplicative recoveries." *Reiter*, —— U.S. at ——, 99 S.Ct. 2326.

25. ESI cites several cases to bolster its view that Watercraft and Durham have standing under § 4. *Hoopes v. Union Oil Co. of Calif.*, 374 F.2d 480 (9th Cir. 1967); *Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.*, 368 F.2d 679 (8th Cir. 1966); *South Carolina Council of Milk Producers, Inc. v. Newton*, 360 F.2d 414 (4th Cir.), *cert. denied*, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966); *Harman v. Valley National Bank of Arizona*, 339 F.2d 565 (9th Cir. 1964); *Twentieth Century-Fox Film Corp. v. Goldwyn*, 328 F.2d 190 (9th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964). Those cases do not advance the argument. Factually, all are different; substantively, three of the

cases, *Hoopes, South Carolina Council of Milk Producers, Inc.*, and *Harman*, involved reversals of dismissals or summary judgments against plaintiffs, with the courts' commenting that a triable issue was presented on the pleadings. The Supreme Court has cautioned against summary procedures in antitrust litigation. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The other cases relied on by ESI are clearly not apposite, since the anticompetitive acts were either specifically directed at the plaintiff or entailed injury within the market level at which plaintiff was operating. *Perkins v. Standard Oil Co.*, 395 U.S. 642, 90 S.Ct. 1989, 26 L.Ed.2d 534 (1969), adds no weight to ESI's position: *Perkins directly* suffered price discrimination in its purchases from defendant Standard and the Court aptly said that Standard could not protect itself from a Robinson-Patman violation by adding one layer to the distribution system. *Perkins* in no way lessens the requirement for standing under § 4 of the Clayton Act, *i. e.*, one must be within the "target area" to receive protection. Here, by contrast with the cited cases, the anticompetitive acts were not levelled against Watercraft and Durham, but rather against ESI. The market area affected by the conspiracy to divide markets at the manufacturing level does not impact the distributor level except remotely, indirectly and incidentally.

We therefore conclude that neither Watercraft nor Durham had standing under section 4 of the Clayton Act, 15 U.S.C. § 15.

### E. The Tort Claim

Bombardier contends that judgment should be entered in its favor on ESI's claim of tortious interference with a contractual relationship and tortious inducement to breach contract on two grounds: first, that the court below erroneously applied the law of Pennsylvania rather than Italy, and, second, that even under Pennsylvania law, ESI failed to present a jury claim.

### 1. The Conflicts Question

■ Massachusetts conflicts law governs which law should apply to the tort claim. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Roy v. Star Chopper Co., Inc., supra*, 584 F.2d at 1128. Massachusetts has historically adhered to the lex loci delicti conflicts rule for torts. *Brogie v. Vogel*, 348 Mass. 619, 205 N.E.2d 234 (1965). Recently, the Massachusetts Supreme Judicial Court, while maintaining its adherence to this rule for "the vast majority of issues in multi-state tort suits[,]" *Pevoski v. Pevoski*, 371 Mass. 358, 358 N.E.2d 416, 417 (1976), indicated that where the question revolved around standards of conduct, it would look to the law of the jurisdiction having the strongest interest in resolving the particular issue presented. *Ibid.* This test is found in the Restatement (Second) of Conflict of Laws §§ 145, 146 (1971). *See also Tessier v. State Farm Mutual Ins. Co.*, 334 F.Supp. 807, 808 (D.Mass.1971), *aff'd*, 458 F.2d 1299 (1st Cir. 1972). Applying either test, we find no error in the district court's application of Pennsylvania rather than Italian law.[26] The place of injury is where plaintiff suffered the harm, i. e., at its place of business, Pennsylvania. The forum with the most significant contacts is similarly Pennsylvania: (a) It is the place where the injury occurred. (b) It was at the November, 1970, meetings in Philadelphia that Bombardier and Agrati initialed their agreement not to compete and appointed Bombardier Agrati's new exclusive dealer. The formal signing in Italy later was admitted by Bombardier's president to be a mere confirmation of the Philadelphia accord, so that it was there the conduct occurred which caused ESI's injury. (c) ESI is a Pennsylvania corporation and Bombardier a Canadian one; as between Pennsylvania and Italy, Pennsylvania should be favored since at least one of the parties is incorporated there. *See* Restatement (Second) of Conflict of Laws § 145.

### 2. Pennsylvania Law on Tortious Interference

■ Bombardier alleges that Pennsylvania requires a showing of intent to cause harm in suits claiming tortious interference with contractual relations, citing *Birl v. Philadelphia Elec. Co.*, 402 Pa. 297, 167 A.2d 472 (1960), and *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895 (1971). Neither case stands for the proposition that a specific intent to cause harm is essential to a case of tortious interference. *Birl* restates the common law rule that an intentional, unprivileged interference with a contractual relationship gives rise to a tort action. The court there relied on the Restatement of Torts § 766 which articulates the rule. The *Birl* court makes it clear that intent to cause harm in the sense that defendant must evince "malice" toward plaintiff is not required, merely that defendant must act with the purpose of causing the specific harm cited, *viz.*, interfering with the known contract. *Id.* at 474. *Glenn v. Point Park College, supra*, extends liability to interfer-

---

26. ESI contends that, in fact, no different result would obtain irrespective of whether Italian or Pennsylvania law is applied. This has been termed the "false conflicts" theory by Prof. Brainerd Currie. Comment, *False Conflicts*, 55 Calif.L.Rev. 74 (1967). *See In Re Air Crash Disaster At Boston, Mass., July 31, 1973*, 399 F.Supp. 1106, 1115 n.13 (D.Mass.1975). This theory is invoked when (1) there is no true conflict of laws because only one state is interested in the application of its law or (2) the laws of the two states are found to be compatible. It is the latter prong on which ESI forwards its argument.

ence with prospective contractual relations as well. The Pennsylvania court quotes the Restatement (Second) of Torts § 766A, Comment d (Tent. Draft No. 14), to wit, that defendant must intend the interference and have acted at least in part to effectuate the interference. 272 A.2d at 899. *See also Adler, Barish, Daniels, Levin, etc. v. Epstein,* 393 A.2d 1175, 1181–4 (Pa. 1978). There is no warrant for finding either that the court below improperly instructed the jury on the intent necessary to sustain liability under the tort or that there was an absence of probative evidence from which the jury could have found that Bombardier knowingly, intentionally, and improperly interfered with ESI's contractual relationship and induced Agrati to cancel its contractual relationship with ESI.

F. *Lost Profits and Attorney Fees for Willful Contempt*

█ The district court enjoined Bombardier from selling Agrati minicycles in September, 1971. We affirmed. 454 F.2d 527. After requests by Bombardier for clarification, the district court made clear that the injunction extended to spare parts for the cycles. Notwithstanding the fact that the court twice indicated that the injunction covered spare parts, both Bombardier and its subsidiaries continued to sell them, up until and after the time a motion for contempt was filed in February, 1972, by ESI. On July 27, 1972, the district court found Bombardier to have willfully violated the preliminary injunction and found it in civil contempt. The court accordingly ordered damages, to be based on all sales of spare parts made or supplied by Agrati to Bombardier from September 13, 1971, through July 27, 1972. Damages were computed at the list price for which ESI would

have sold the parts. The court allowed plaintiff to recover all attorney fees incurred in prosecuting of the contempt proceeding. Bombardier here argues that the court erred in permitting full damages and in permitting ESI to recover attorney fees for its counsel's standard hourly billing rates multiplied by the hours actually spent on the contempt matter. Bombardier puts itself in a vulnerable position by arguing either point. As the court below found, Bombardier's actions with respect to the preliminary injunction were willfully contemptuous. We find nothing to suggest that the court's method of computing damages was improper. As far as attorney fees go, Bombardier stymied ESI at every juncture during the proceedings—which lasted for two and one-half years following the July, 1972, finding by the court of willful contempt—for a determination of costs and damages. ESI was forced twice to seek a motion to compel, *see* Fed.R.Civ.P. 37, and engaged in extensive and contested discovery to ascertain the true amount of damages. The predictable result of such behavior is that ESI's attorney fees were much higher than they would have been had the necessary information been disgorged earlier and easier. We do not find that the district court abused its discretion in allowing recovery of full attorney fees in prosecuting the contempt.[27]

*The judgment is reversed with respect to Durham and Watercraft with an order that judgment n. o. v. be entered for defendants as to those plaintiffs. In all other respects, the judgment is affirmed.*

---

**27.** Bombardier contends that time spent on theories which the district court rejected in finding contempt should not have been chargeable against Bombardier. The amounts in question approximate $1,150. A total of $20,115.14 in fees and costs was allowed by the court. We find no abuse of discretion in the court's refusing to excise relatively minor amounts of time spent by plaintiff's counsel on theories which the court ultimately rejected. Bombardier ran the risk of incurring attorney fees by its contumacious behavior. That the plaintiff was unable to successfully predict which theories the court would accept and which it would reject requires a nicety we are not willing to impose. "Certainly it was not an abuse of discretion in this case to impose as a penalty, compensation for the expenses incurred by the successful party to the decree in defending its rights . . . ." *Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 428, 43 S.Ct. 458, 466, 67 L.Ed. 719 (1923).